

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

12-7-2007

# USA v. Kellogg

Precedential or Non-Precedential: Precedential

Docket No. 05-1893

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"USA v. Kellogg" (2007). *2007 Decisions.* Paper 12.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/12

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL
IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No: 05-1893
_____

UNITED STATES OF AMERICA

v.

EDWARD V. KELLOGG,

Appellant
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 03-cr-00321)
District Judge: Honorable James Knoll Gardner
_____

Argued September 25, 2007

Before: AMBRO, JORDAN and ROTH, *Circuit Judges*

(Filed: December 7, 2007)
_____

Seth Weber [ARGUED]
United States Attorney's Office
504 West Hamilton Street - Suite 3701
Allentown, PA   17901

Robert Epstein
Brett G. Sweitzer [ARGUED]
Defendant Assn. Of Philadelphia
Federal Court Division
601 Walnut Street - Ste. 504
Philadelphia, PA   19106

_____

OPINION OF THE COURT
_____

JORDAN, *Circuit Judge.*

Edward V. Kellogg ("Kellogg") appeals from a judgment of conviction following a jury verdict finding him guilty on thirty-four counts of mail fraud pursuant to 18 U.S.C. §§ 1341 and 2.  The primary issue before us is whether the District Court erred by allowing the government to cross-examine a character witness with a question based on the

assumption of Kellogg's guilt.  Finding no error, we will affirm the judgment of the District Court.

## BACKGROUND[1]

Kellogg was the owner, President, and Quality Control Officer of Johnston Laboratories, Inc. ("Johnston Laboratories"), located in New Cumberland, Pennsylvania. Johnston Laboratories provided environmental testing services, specifically, analytical testing of environmental samples, including water and wastewater, in order to determine the presence and concentration of contaminants. Many of Johnston Laboratories' customers were required to comply with environmental laws and regulations administered

---

[1]Because we are reviewing a guilty verdict, we have cast the facts in the light most favorable to the government.  *See United States v. Pungitore*, 910 F.2d 1084, 1097 (3d Cir. 1990) ("We are bound, after a jury has delivered a guilty verdict, to interpret the evidence in a light most favorable to the government.").

by the United States Environmental Protection Agency ("EPA") and the Pennsylvania Department of Environmental Protection ("PA DEP"). Among the tests that customers ordered from Johnston Laboratories were those for Volatile Organic Chemicals ("VOC"), contaminants whose presence in water is regulated by the EPA and PA DEP. In particular, Johnston Laboratories' customers required testing under an EPA protocol called Method 601/602, which tests for approximately fifty-six contaminants, as opposed to EPA Method 624, which tests for approximately thirty contaminants.

From May 1998 to March 1999, Johnston Laboratories did not possess the appropriately operating equipment to perform VOC testing under EPA Method 601/602. During that time period, Johnston Laboratories subcontracted its VOC testing and analysis to another environmental testing

laboratory, Hydro-Analysis Associates, Inc. ("Hydro-Analysis"). However, Kellogg knew that Hydro-Analysis also could not and did not perform VOC testing under EPA Method 601/602, as required by Johnston Laboratories' customers, but instead used EPA Method 624. Nonetheless, Kellogg authorized Hydro-Analysis to test the water samples of Johnston Laboratories' customers using the less sensitive method.

Kellogg caused Johnston Laboratories to mail to its customers reports falsely stating that EPA Method 601/602 had been used to test the samples, even though only EPA Method 624 had been used. Kellogg, also through Johnston Laboratories, fraudulently billed customers for the results of environmental VOC testing that was not performed according to the methods ordered by those customers.

In all, Kellogg was charged with causing thirty-four separate, false and fraudulent VOC environmental test reports and billing statements for those reports to be delivered by mail to Johnston Laboratories' customers from May 1998 to March 1999, in violation of 18 U.S.C. §§ 1341 and 2. Following a three week jury trial, Kellogg was found guilty on all counts. He appeals the judgment of the District Court, entered March 16, 2005. The District Court had jurisdiction pursuant to 13 U.S.C. § 3231. We have appellate jurisdiction pursuant to 28 U.S.C. § 1291.

## DISCUSSION

### I.     *Cross-examination of Opinion Character Witnesses*

Kellogg claims his right to due process was violated when the District Court allowed the government to cross-examine certain of his character witnesses using a hypothetical that assumed he was guilty of the crimes charged

in this case. We review a District Court's ruling on the scope of cross-examination for abuse of discretion. *United States v. Serafini*, 233 F.3d 758, 768 n.14 (3d Cir. 2000); *United States v. Furst*, 886 F.2d 558, 577 (3d Cir. 1989). As to the District Court's legal interpretation of the Federal Rules of Evidence and its ruling on Kellogg's due process claim, our review is plenary. *See United States v. Bobb*, 471 F.3d 491, 497 (3d Cir. 2006); *United States v. Mack*, 229 F.3d 226, 231 (3d Cir. 2000) (citation omitted).

Kellogg raises identical issues with respect to two of his character witnesses – Saleh Malik and Fred Pennington, Jr. The circumstances of the cross-examination of each is reviewed in turn.

**A.** *Saleh Malik*

Defense witness Saleh Malik gave testimony

supporting Kellogg's character as a law-abiding citizen.

During the government's cross-examination of Malik,

Kellogg objected to the following question[2]:

---

[2]During trial, defense counsel merely stated "objection" on
the record. (Appx. 1998-9.) Once overruled, the trial
proceeded without any additional discussion of the question
posed to Malik. Notably, the record does not reflect that
Kellogg's counsel advanced the argument about guilt-
assuming hypotheticals that is now presented on appeal.
Normally, this would constitute a waiver of the argument.
*See* Fed. R. Evid. 103(a) (restricting appellate review of
evidentiary errors to those in which the complaining party has
"stat[ed] the specific ground of objection, if the specific
ground was not apparent from the context ...."). Although the
degree of specificity required by Rule 103(a) is not perfectly
clear, it has been established that general objections will not
suffice. *United States v. Sandini*, 803 F.2d 123, 126 (3d Cir.
1986) (citing *United States v. Blackshear,* 568 F.2d 1120,
1121 (5th Cir. 1978)). However, the government has not
advanced a waiver argument, and both parties have addressed
the issue on its merits in their briefing and at oral argument.
Since we are addressing the guilt-assuming hypothetical
argument with respect to the cross-examination of
Pennington, we choose to address it as to the cross-

Q.  Do you have any knowledge about the way Mr. Kellogg ran his environmental laboratory back in 1998?...[3]

The District Court overruled the objection and said that "[t]he government may test the opinions concerning character, and the testimony concerning reputation, [by] testing the witness's knowledge of the defendant and his business...." (Appx. 1999.)

On appeal, Kellogg argues that the challenged question was improper.  More specifically, Kellogg's position is that the cross-examination was impermissible because it assumed the criminal conduct at issue in this case had in fact occurred and that the question thereby violated his right to due process

_____

examination of Malik as well.

[3]    The question elicited this brief response: "I know generally, like, you know, he ran the laboratory, but I wasn't aware how he ran the laboratory."  (Appx. 1999.)

by undermining the presumption of innocence.  The

government responds that the question was unobjectionable

because the prosecution was entitled to test the extent of

Malik's knowledge of Kellogg's business practices.

Control of cross-examination is largely within the trial

court's discretion.  *See Michelson v. United States*, 335 U.S.

469, 480 (1948) (...[R]arely, and only on a clear showing of

prejudicial abuse of discretion [,] will Courts of Appeals

disturb the ruling of trial courts on this subject.").  Federal

Rule of Evidence 405(a) expressly allows the government to

cross-examine character witnesses regarding their knowledge

of specific instances of the defendant's conduct.  Fed. R.

Evid. 405(a) ("In all cases in which evidence of character or a

trait of character of a person is admissible, proof may be made

by testimony as to reputation or by testimony in the form of

an opinion.  On cross-examination, inquiry is allowable into

relevant specific instances of conduct.").  Such cross-examination may help the jury evaluate the reliability of the character testimony.  *United States v. Shwayder*, 312 F.3d 1109, 1120 (9th Cir. 2002).

Here, the government simply asked Malik whether he knew how Kellogg ran his business, a question which plainly falls within the purview of Rule 405(a).  We are unpersuaded by Kellogg's argument that the government's question to Malik was in essence a guilt-assuming hypothetical.  The question does not assume Kellogg's guilt; it does not refer even obliquely to the conduct that formed the basis of the charged crimes.  Rather, because Malik offered his personal opinion about Kellogg's character, the District Court properly allowed the prosecution to test the foundation for that opinion by asking a question that could elicit a response demonstrating how well Malik knew Kellogg in the relevant arena of day-to-day business.  Therefore, the District Court

did not err by allowing the challenged cross-examination question put to Malik.

**B.**     *Fred Pennington, Jr.*

Kellogg also argues that the government's cross-examination of Fred Pennington, Jr. contained an impermissible guilt-assuming hypothetical.  Like Malik, Pennington testified to Kellogg's character as a law-abiding citizen.  Kellogg objected when the government, during cross-examination, posed the following line of questions:

> Q.  Sir, would you agree with me that a person who knows that a laboratory used one particular analytical method, but then who reports out a complete-ly different analytical method on final reports of analysis to its customers, would your opinion be different about that person being [a] law abiding citizen?
>
> A.  Is this a hypothetical question, or is this specific to this case?
>
> Q.  I'm asking you a hypothetical question.
>
> A.  I think my opinion would be different.

(Appx. 2021.)  The Court overruled Kellogg's objection and,

immediately after the quoted line of questioning, *sua sponte*

instructed the jury as follows:

> This evidence – this question and answer that was just asked of this witness to test his opinion was offered for a limited purpose and I have to briefly explain to you the limitations of what it was presented for and what it was not presented for.
>
> This witness on direct examination expressed opinion that the defendant had a character – the defendant's character was consistent with that of being a law abiding citizen.  He also testified that he knows people who know the defendant, and that the defendant's reputation among others for being a law abiding citizen is excellent.  So he gave both what we call opinion evidence and reputation evidence on the defendant's character for being a law abiding citizen.  In his opinion, he's a law abiding citizen, and his reputation in the community for being a law abiding citizen is excellent according to the testimony.
>
> Now, as [is] the case of any witness, you must decide whether you believe or you don't believe the testimony of the witness.  We will give you more detailed instructions at the end of the trial about what you do with opinion evidence and what you do with reputation evidence, and how that might affect your final decision in your verdict in the case.  For now it's only necessary and important for me to indicate to you that the cross-examination which

was heard by you is cross-examination on the opinion evidence. It is not cross-examination on the reputation evidence. In other words, he expressed the opinion that the person, the defendant has a character – his character is consistent with being a law abiding citizen, and so he was permitted to be asked whether – if someone used a particular analytical method, but reported to a customer that he used a different analytical method, would that hypothetical circumstance change your opinion or result in your giving – have a different opinion, and his answer was yes.

So you may consider that in weighing the opinion testimony of this particular witness's opinion, but you may not consider that answer, and it's not being offered, on his other testimony that the defendant has a reputation, excellent reputation in the community for being law abiding, because that reputation is based on the views and opinions of others, not of this individual. Those others can't be cross-examined by this question, that's why we limit it.

(App. 2022-23.)

As detailed herein, the District Court subsequently stated its reasons for overruling Kellogg's objection on the record, outside of the presence of the jury, prior to giving this limiting instruction.

-14-

### 1.    *Permissibility of a Guilt-Assuming Hypothetical*

Kellogg argues that the District Court violated his right to due process and erred under Federal Rule of Evidence 405(a) by permitting the government to pose a question that assumed Kellogg is guilty of the charged offense.

The District Court relied primarily on *United States v. Curtis*, 644 F.2d 263 (3d Cir. 1981), in overruling Kellogg's objection to the question posed to Pennington.  There we recognized that Rule 405(a) "provides that proof of character may be made by testimony as to reputation or by testimony in the form of an opinion" and emphasized the necessity "for keeping separate the two different types of character evidence" permitted under the Rule – those being reputation character evidence and opinion character evidence.  *Id.* at 267, 268 (internal quotation marks omitted).  In sum, reputation character evidence is "that of the [defendant's] reputation in the community for the character trait at issue," *id.* at 267, while opinion character evidence is elicited when a

-15-

defendant's character witness provides his or her own personal opinion of "any facet of the [defendant's] character," *id.* at 265. The District Court also considered *United States v. Mason*, 933 F.2d 406 (4th Cir. 1993), in which the United States Court of Appeals for the Fourth Circuit held that a guilt-assuming hypothetical is improper regardless of whether the government is cross-examining a reputation or an opinion character witness. However, the District Court declined to follow *Mason* because it found the Fourth Circuit's approach contrary to Federal Rule of Evidence 405(a) and our decision in *Curtis*.

As noted in the District Court's limiting instruction, there is a distinction between reputation character evidence and opinion character evidence. *See Curtis*, 644 F.2d at 269 ("...Rule 405(a) has not effected a merger between reputation and opinion evidence."). However, that distinction has not been significant to a majority of the Courts of Appeals that have addressed the propriety of guilt-assuming hypotheticals.

Without necessarily distinguishing whether the issue involved cross-examining an opinion witness or a reputation witness, those courts have broadly held such questions are improper. *See United States v. Shwayder*, 312 F.3d 1109, 1121 (9th Cir. 2002) ("The prosecution's use of guilt-assuming hypothetical questions on cross-examination of Shwayder's character witnesses...constituted error."); *United States v. Guzman*, 167 F.3d 1350, 1352 (11th Cir. 1999) ("The government may not...pose hypothetical questions that assume the guilt of the accused in the very case at bar."); *United States v. Mason*, 993 F.2d 406, 408 (4th Cir. 1993) (guilt-assuming hypotheticals are "not proper and should not have been allowed"); *United States v. Oshatz*, 912 F.2d 534, 539 (2d Cir. 1990) ("...[A] hypothetical question based on the assumption of guilt should not be asked.") (internal quotation marks and citation omitted); *United States v. Williams,* 738 F.2d 172, 177 (7th Cir. 1984) ("We hold that permitting this line of cross-examination [guilt-assuming hypotheticals] over objection

was error, and we see no reason to treat reputation and opinion witnesses differently in this regard.") (citation omitted); *United States v. McGuire*, 744 F.2d 1197, 1204 (6th Cir. 1984) ("It would be error to allow the prosecution to ask the character witness to assume defendant's guilt of the offenses for which he is then on trial."); *but see United States v. White*, 887 F.2d 267, 275-6 (D.C. Cir. 1989) (using guilt-assuming hypotheticals during cross-examination of character witnesses "who...give their own opinion of the defendant's character is not error"). Generally, the reason given for these holdings is that a guilt-assuming hypothetical impairs the presumption of innocence and thus violates the defendant's due process rights. *Guzman*, 167 F.3d at 1352; *Mason*, 993 F.2d at 409; *Oshatz*, 912 F.2d at 539; *Shwayder*, 312 F.3d at 1121; *Williams*, 738 F.2d at 177.

A few Courts have also noted that an alternative basis for holding guilt-assuming hypotheticals are improper is that they are unfairly prejudicial to the defendant, *Oshatz*, 912

F.2d at 539, *Williams*, 738 F.2d at 177, which would indeed seem to follow necessarily from a conclusion that there had been a due process violation. The Second Circuit has acknowledged that a guilt-assuming hypothetical may elicit evidence of some probative value, particularly when posed to an opinion character witness, since "[s]teadfast adherence to a favorable opinion by a witness asked to assume the defendant's guilt might provide some basis for concluding that the witness is simply supporting the defendant, rather than providing credible testimony about his character." *Oshatz*, 912 F.2d at 539. However, the Court concluded that any probative value was outweighed by the risk that "after a jury has repeatedly heard a prosecutor assure a trial judge that he has a good faith basis for asking permitted hypothetical questions, the jury might infer from the judge's permission to ask a guilt-based hypothetical question that the prosecutor has evidence of guilt beyond the evidence in the record." *Id.* The Seventh Circuit also commented on the potentially prejudicial

impact of a guilt-assuming hypothetical, suggesting that such questions allow "the prosecution to foist its theory of the case repeatedly on the jury." *Williams*, 738 F.2d at 177.

Several other Courts of Appeals have had the opportunity to consider guilt-assuming hypotheticals, but only in the context of reputation testimony, where such questions are uniformly held to be impermissible. *See United States v. Barta*, 888 F.2d 1220, 1224-5 (8th Cir. 1989); *United States v. Polsinelli*, 649 F.2d 793, 796-7 (10th Cir. 1981); *United States v. Calendaria-Gonzalez*, 647 F.2d 291, 294 (5th Cir. 1977). These Courts too have reasoned that allowing the prosecution to ask a question that assumes the defendant's guilt would infringe upon the presumption of innocence. *Barta*, 888 F.2d at 1224; *Calendaria-Gonzalez*, 547 F.2d at 294. The Fifth Circuit has provided the further persuasive explanation that a guilt-assuming hypothetical cannot sensibly be asked of a reputation witness because reputation testimony is based on what the witness heard in the community about

the defendant, and "[o]bviously the character witness ... had heard nothing in the community about [the defendant's] post conviction reputation when he had been convicted of nothing whatsoever." *Calendaria-Gonzalez*, 546 F.2d at 294.

## 2. *The District Court Did Not Err*

With these views of our sister Circuits in mind, we turn to the main issue presented by Kellogg's arguments on appeal: whether the government's question to Pennington was impermissible. The answer to that question turns on the meaningful distinction between reputation and opinion character witnesses.[4] We agree with the consensus of the

_____

[4]Perhaps the clearest exposition of this distinction between reputation character witnesses and opinion character witnesses is set forth in the concurring opinion in the Second Circuit's *Oshatz* case. Then-District Judge Michael B. Mukasey, sitting by designation, asserted that a guilt-assuming hypothetical should be permissible during the cross-examination of an opinion character witness. First, he explained why such a question has significant probative value:

> A jury evaluating the testimony of an opinion witness...must determine two things: how well the witness knows the defendant, and by what

-21-

standard the witness judges the defendant. Both are essential in order for the jury to weigh the testimony. If the witness does not know the defendant well, it is unlikely the witness will have seen enough of the defendant's behavior to judge his character. If the witness' judgment is distorted either by such partisanship that the witness would think highly of the defendant despite misbehavior, or by a warped ethical standard, the witness' opinion may be correspondingly discounted. A strong enough partisan would swear truthfully that the defendant is a person of good character even if he has committed the crime on trial; a witness who thinks the crime on trial is not inconsistent with good character would do the same. The question at issue in this case probes both the witness' bias and the witness' own standards by asking whether the witness would retain a favorable opinion of the defendant even if the evidence at trial proved guilt.

*Oshatz*, 912 F.2d at 544. Judge Mukasey then endeavored to rebut the view that a guilt-assuming hypothetical would infringe upon the presumption of innocence. He reasoned that no rational jury could conclude that, because a witness was asked to assume the defendant's guilt for the purpose of testing that witness' opinion, it should therefore apply a similar assumption in weighing the evidence. *Id.* at 545. Furthermore, he noted, there are several procedures that protect the presumption of innocence. Following the examination of a character witness, the trial judge instructs the jury that any hypothetical was used for the limited purpose of testing the witness' opinion and does not bear on the

-22-

Courts of Appeals that posing a guilt-assuming hypothetical to a reputation character witness is improper. *Cf. Curtis*, 644 F.2d at 269 ("...[A] reputation witness can only be examined on matters reasonably proximate to the time of the alleged offense and likely to have been known to the relevant community at that time."). Because a reputation character witness, by definition, can only provide testimony about the defendant's reputation in the community, a person testifying regarding the defendant's reputation at the time of the crime can only speculate about how information regarding the crime would affect the community's assessment of the defendant, and a witness's speculation in that regard is of no probative value at all.

As to cross-examination of opinion character witnesses, however, while we recognize that a question like the one posed by the government in this case may prove

defendant's guilt or innocence. *Id.* In addition, the presumption of innocence is reiterated in the jury charge and often in the defense's summation. *Id.*

problematic if it arises in circumstances that implicate the presumption of innocence or otherwise undermine due process, such circumstances are a possibility and by no means a certainty. In our view, there is nothing inherent in guilt-assuming hypotheticals, in the abstract, that makes them unfairly prejudicial, let alone so prejudicial as to constitute a *per se* violation of due process. We therefore see no need to adopt a bright-line rule prohibiting a potentially probative type of inquiry. Generally speaking, a person testifying regarding a present opinion should be open to cross-examination on how additional facts would affect that opinion. In the context of opinion character testimony cross-examination about the charged crime tests "both the witness' bias and the witness' own standards by asking whether the witness would retain a favorable opinion of the defendant even if the evidence at trial proved guilt." *Oshatz*, 912 F.2d at 544 (Mukasey, J., concurring). Such evidence may aid in the

jury's ultimate credibility determinations and in deciding how much weight to give to a defendant's character evidence.

In this case, the District Court did not err by permitting the government to pursue the challenged cross-examination of Pennington. *Cf. United States v. Palmere*, 578 F.2d 105, 107 (5th Cir. 1978) ("[A]ny reversal here would have to rest on a determination that one asking of such questions [guilt-assuming hypotheticals] constitutes plain error. We conclude that it does not."). The parties agree that the question posed to Pennington was relevant,[5] and its hypothetical nature was so emphasized as to allay any real concern about undermining the presumption of Kellogg's innocence. Further, because it was but one question posed to one witness during the course of a three-week trial, this is not a situation where Kellogg was unfairly prejudiced by the prosecution repeatedly "foist[ing] its theory of the case...on the jury." *Williams*, 738 F.2d at

---

[5]Both government and defense counsel agreed, during oral argument, that the question posed to Pennington was indeed relevant to the case.

177. Nor was this a scenario, such as the one contemplated in *Oshatz*, where the jury "repeatedly hear[d] [the] prosecutor assure [the] trial judge that he ha[d] a good faith basis for asking permitted hypothetical questions" and thus "infer[red]...that the prosecutor ha[d] evidence of guilt beyond the evidence in the record."  912 F.2d at 539.  Finally, while the asking of a guilt-assuming hypothetical has been found to be reversible error when the case involved a swearing contest between the defendant and a key government witness, *see, e.g., United States v. Polsinelli*, 649 F.2d 793, 798 (10th Cir. 1981) (finding reversible error where the case "was, in a sense, a one-on-one situation, i.e., it was the word of the defendant against the word of McFarland, the key government witness"), that plainly was not the case here.     To be clear, we are not suggesting, let alone holding, that guilt-assuming hypotheticals can properly be asked of opinion character witnesses in every case.  However, in light of the facts and circumstances of this case, the District Court did not err by

permitting the government's cross-examination of Pennington

with the guilt-assuming hypothetical at issue.[6]

## II.    *The District Court Did Not Abuse its Discretion in Admitting Evidence Offered Pursuant to Rule 404(b)*

Kellogg also argues that the District Court erred by

allowing the government to introduce certain evidence

pursuant to Federal Rule of Evidence 404(b).[7]  When

considering the District Court's decisions on the admission of

[6]It seems that the issues surrounding guilt-assuming hypotheticals may typically be avoided by asking an opinion character witness about specific details raised by other evidence in the case, rather than putting to the witness a hypothetical that incorporates the conclusion to which the details might lead.  Such an approach could have the added benefit of greater persuasive force, since jurors may be likelier to be persuaded by evidence that leads logically to a conclusion than by an abrupt presentation of the conclusion itself.

[7]Federal Rule of Evidence 404(b) provides, in relevant part:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith.  It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident....
> Fed. R. Evid. 404(b).

evidence, we review for abuse of discretion. *United States v.*

*Jemal*, 26 F.3d 1267, 1272 (3d Cir. 1994). Rule 404(b) is a

rule of inclusion rather than exclusion. *United States v.*

*Givan*, 320 F.3d 452, 460 (3d Cir. 2003) (citing *Jemal*, 26

F.3d at 1272); *see also United States v. Copple*, 24 F.3d 535,

545 (3d Cir. 1994) ("Proving specific intent in mail fraud

cases is difficult, and, as a result, a liberal policy has

developed to allow the government to introduce evidence that

even peripherally bears on the question of intent."). Hence,

"[t]rial court rulings under Rule 404(b) ... may be reversed

only when they are 'clearly contrary to reason and not

justified by the evidence.'" *United States v. Balter*, 91 F.3d

427, 437 (3d Cir. 1996) (citing *United States v. Bethancourt,*

65 F.3d 1074, 1079 (3d Cir. 1995), *cert. denied,* 516 U.S.

1153, 116 S. Ct. 1032, 134 L. Ed. 2d 109 (1996) (citation

omitted)). Similarly, in order to justify reversal of a District

Court's balancing of probative and unfairly prejudicial

qualities of evidence under Rule 403, the District Court's

"analysis and resulting conclusion must be 'arbitrary or irrational.'" *United States v. Universal Rehabilitation Services (PA), Inc.*, 205 F.3d 657, 665 (3d Cir. 2000) (citation omitted). Indeed, "[i]f judicial self-restraint is ever desirable, it is when a Rule 403 analysis of a trial court is reviewed by an appellate tribunal." *Id.* (citation omitted). Given these standards, we hold that the District Court did not abuse its discretion in this case.

The District Court admitted evidence that PA DEP revoked Johnston Laboratories' certification for testing drinking water. It also admitted the testimony of two former Johnston Laboratories employees regarding deficient procedures at Johnston Laboratories and it admitted evidence of certain misrepresentations Kellogg made to PA DEP. The challenged evidence was offered by the government as proof of Kellogg's knowledge and fraudulent intent, pursuant to Rule 404(b). We address each of those sets of evidence in turn.

### A.     *The Decertification Evidence*

Kellogg argues that the decertification evidence was irrelevant to the charges in this case, as it pertained only to Johnston Laboratories' decertification for drinking water testing, as opposed to non-drinking water testing.  Kellogg also argues that the evidence is impermissible under Rule 404(b) because it is being offered for an improper purpose and not for one of the specific reasons articulated by the Rule.

The decertification evidence was provided by James Yoder and Richard Sheibley.  Yoder, an employee in the lab certification section of PA DEP's Bureau of Laboratories, testified as an expert in environmental lab certification and stated that he knew Kellogg because Johnston Laboratories applied to be a certified lab in the PA DEP drinking water program.[8]  Yoder conducted a February 20, 1997 inspection of Johnston Laboratories and wrote a report regarding that

---

[8]The record indicates that there is no certified program for waste water or ground water analysis.  (Appx. 1530.)

inspection on March 12, 1997, which he subsequently sent to

Kellogg.  Yoder provided detailed testimony on the numerous

deviations[9] set forth in his written report, including problems

with the laboratory relating to VOC analysis.

Yoder returned to Johnston Laboratories for another

inspection on January 28 and 29, 1998, and prepared a

February 20, 1998 report about that inspection that was also

sent to Kellogg.  Some of the deviations found during the

February 20, 1997 inspection were not corrected and

remained as deficiencies during the January 1998 inspection,

particularly those related to quality control and quality

assurance.  The PA DEP inspectors discussed these

continuing deficiencies with Kellogg.

Richard Sheibley, the chief of the PA DEP laboratory

accreditation program, testified as an expert on laboratory

accreditation.  Sheibley knew about Yoder's inspection of

---

[9]In this context, "deviations" refers to instances of actual
procedures differing from approved or required procedures at
Johnston Laboratories.

Johnston Laboratories in February 1997, and Sheibley personally participated in the January 28 and 29, 1998 on-site inspection of Johnston Laboratories. He met with Kellogg and other Johnston Laboratories employees to discuss the inspection procedure before the actual inspection on January 28, 1998. During the two day on-site inspection, fifty-seven deviations were found. Sheibley testified that the inspectors conducted an exit interview with Kellogg during which they discussed the numerous deviations and required corrective actions. Sheibley further testified that, due to the number of deviations found during the inspection, PA DEP decided to decertify Johnston Laboratories, or, in other words, to remove it from the list of labs approved to do drinking water testing.

Sheibley testified that the decision to decertify Johnston Laboratories was based, in part, on the need to protect the public's health, safety and welfare. He stated that Johnston Laboratories did not follow its own required quality control procedures, that Kellogg, as the laboratory supervisor,

was responsible for assuring that Johnston Laboratories met the required quality assurance and regulatory criteria, and that Kellogg ultimately failed in carrying out that responsibility.

The government gave pretrial notice of its intent to introduce evidence pursuant to Rule 404(b) relating to the inspection of Johnston Laboratories conducted by PA DEP in January 1998, the subsequent revocation of Johnston Laboratories' certification for testing drinking water, and Johnston Laboratories' allegedly deficient laboratory practices. During a September 5, 2003 hearing, the District Court held that this evidence was admissible.

With respect to the decertification evidence, the District Court determined that the evidence was relevant to the government's case pursuant to Federal Rules of Evidence 401 and 402, and that, under Rule 403, the potential for unfair prejudice did not outweigh the probative value of the evidence. As to relevance, the District Court stated:

> The decertification gives the defendant evidence that something is wrong at Johnston

Laboratories.  If Mr. [Kellogg] received that information and takes no affirmative action, a jury can, but does not have to, infer that the defendant intended to defraud.  The jury can, although it does not have to, draw this inference.  But if it can draw this inference, the evidence has relevance.  (Appx. 140.)

The District Court also agreed with the government's argument that the decertification evidence was admissible to prove Kellogg's knowledge and intent.  Recognizing and applying the guidelines for admissibility under Rule 404(b) set forth by the Supreme Court in *Huddleston v. United States*, 485 U.S. 681, 108 S. Ct. 1496 (1988)[10], and

---

[10]These guidelines are as follows: first, the other crimes evidence must have a proper purpose; second, the proffered evidence must be relevant; third, its probative value must outweigh its potential for unfair prejudice; and fourth, the court must charge the jury to consider the other crimes evidence only for the limited purpose for which it is admitted. *Huddleston*, 485 U.S. at 691-92, 108 S. Ct. at 1502; *see also United States v. Scarfo*, 850 F.2d 1015, 1019 (3d Cir. 1988).

conducting the necessary Rule 403 weighing[11], the District

Court reasoned as follows:

> Applying these guidelines to the facts of this case, the first prong, requiring other crimes evidence to have a proper purpose, here, the proper purpose is to establish the knowledge and intent of the defendant.
>
> Two, the proffered evidence must be relevant. Well, it is relevant...because the decertification gives the defendant evidence that something is wrong, and if he took no affirmative action, the jury could infer from that that he intended to defraud his customers.
>
> The third guideline is that the probative value must outweigh its potential for unfair prejudice. The potential for prejudice is there only if the jury concludes that because defendant was negligent and he deceived the [PA DEP] regarding the decertification for drinking water testing, therefore, he must have defrauded in the test results for the non-drinking, which is the subject of this criminal action. [T]hat will be inappropriately concluding, in other words, that because he did something wrong in the past, he did something

---

[11]"In addition to the Rule 404(b) test, evidence of other crimes must also be evaluated against the unfair prejudice standard of Rule 403....In making this determination, the trial judge must appraise the genuine need for the challenged evidence and balance that necessity against the risk that the information will influence the jury to convict on improper grounds." *Id.* at 1019 (citations omitted).

wrong presently. That would be unfair
prejudice. And that potential is eliminated by
complying with prong four, which is the giving
of a limiting instruction.

So if we assume in the balancing test that
a limiting instruction will be heard, understood
and followed [by] the jury, then that will
eliminate or diminish the potential for unfair
prejudice to the degree that the relevance will
outweigh any potential for unfair prejudice.

(Appx. 140-46.)

The District Court's analysis is sound. The Rule

404(b) evidence showed that, in similar matters close in time

to the charged conduct, Kellogg acted deceitfully in the

management of his business. In 1997, after PA DEP found

numerous shortcomings at Johnston Laboratories, Kellogg

represented that the problems were corrected. These

representations were proved false when PA DEP conducted

another inspection in January 1998. The inadequacies at

Johnston Laboratories were so significant that the laboratory

was decertified in February 1998. That Kellogg deceived

state inspectors was probative of his fraudulent intent. The

District Court properly applied the law, and its decision to

admit the decertification evidence was well within the proper exercise of its discretion.

**B.** ***Evidence of Kellogg's Misrepresentations to PA DEP***

The government also presented evidence of Johnston Laboratories' lack of quality control, and Kellogg's misrepresentations to PA DEP, through two former Johnston Laboratories employees – Ronald Andrae and Stephen Williams. Kellogg objected to this evidence, stating that it was only being offered to prove his bad character, and again, not for any permissible purpose articulated by Rule 404(b).

Andrae testified that certain quality assurance and quality control procedures must be followed to validate the data produced in the laboratory, and he also emphasized the importance of a quality assurance plan and a quality control plan in a laboratory, in general. Andrae further testified that Johnston Laboratories had a quality assurance plan in effect in 1998 which was signed and approved by Kellogg. Andrae then testified about numerous aspects of the Johnston

Laboratories quality assurance plan, written by Kellogg, which were supposed to be followed but were not.

Williams testified that Kellogg hired him in 1998 for another of Kellogg's companies, Spectra Services, to perform underground storage tank removals and to serve as a project manager.[12] He further testified that he did not perform any services for Johnston Laboratories, nor did he have anything to do with quality assurance or quality control at Johnston Laboratories. Despite the fact the Williams had no responsibility for these matters at Johnston Laboratories, Kellogg asked Williams, just prior to the January 1998 PA DEP inspection, whether he could put Williams's name down as the Quality Assurance/Quality Control Officer on the list of positions at Johnston Laboratories. Kellogg did not tell Williams that Kellogg planned to provide the positions list to

---

[12]Spectra Services apparently has some business connection with Kellogg's Johnston Laboratories, though the nature of the connection is not entirely clear from the record. (Appx. 1073-74.)

PA DEP, nor did Williams give Kellogg permission to so characterize him to PA DEP.  Nevertheless, Kellogg  listed Williams as the Quality Assurance/Quality Control Officer in information he provided to PA DEP, even though Williams never performed any services in that capacity.

Kellogg specifically objected to the government's use of Williams's testimony at trial, arguing that the evidence violated Rule 404(b) because it showed only bad character in that Kellogg fraudulently listed Williams as Quality Assurance/Quality Control Officer in connection with a PA DEP audit and was irrelevant to the charged conduct.  The defense argued that the jury would impermissibly infer that, because Kellogg made misrepresentations to PA DEP, then he must have prepared fraudulent reports and made misrepresentations to Johnston Laboratories' customers.  After conducting a lengthy colloquy with government and defense counsel, the District Court overruled the objection,

first incorporating by reference the reasons articulated during the September 5, 2003 hearing on this issue, and then stating:

> I did separately perform the balancing test required by 403, concerning today's evidence....
>
> Because of the similarities of the extrinsic evidence to crimes charged there is a considerable amount of probative value.  It is close in time to the charged offense, the charged offenses having allegedly taken place between April 1998 and July 2000 and the extrinsic evidence, here, having taken place in February 1998.  Very shortly before the alleged crimes here.
>
> Also this isn't some fraud [or] alleged fraud or deception by the Defendant in some totally unrelated matter, at some bank when he was trying to get [a] mortgage or bilking some investors who he was trying to bring into some investment scheme, none of which this Defendant is charged with doing.
> ***
> There is a very close nexus between the extrinsic evidence and the crimes charged here. There is a temporal connection, there is a subject matter connection, the same type of fraud or the fraud of listing someone as a quality control officer who wasn't the quality control officer.

(Appx. 1060-63.)

Again, the District Court did not abuse its discretion by admitting this evidence under Rule 404(b). The challenged evidence demonstrates that Kellogg made material misrepresentations to PA DEP when he identified Williams as the Quality Assurance/ Quality Control Officer, though Williams, in fact, never held that position, and supports the government's contention that Kellogg was equally knowledgeable when, just months later, he began a lengthy course of misinforming customers that Johnston Laboratories was performing tests which it in fact did not have the capability to perform and had not subcontracted to anyone who could. During the relevant time period, Kellogg made false statements in order to save his business, which is relevant to the charged conduct that he prepared and mailed false laboratory reports and billing statements to his customers.

In reaching its decision to admit the government's Rule 404(b) evidence, the District Court conducted a careful

analysis, more than once.  It applied the proper guidelines

under *Huddleston*, 485 U.S. at 691-92, 108 S. Ct. at 1502, and

the law of this Circuit to the facts before it, and undertook the

appropriate balancing test under Rule 403, *see Scarfo*, 850

F.2d at 1019, each time Kellogg raised an objection to the

government's Rule 404(b) evidence.  Further, the District

Court provided the jury with explicit instructions defining the

permissible and impermissible uses of the Rule 404(b)

evidence.[13]  The District Court did not abuse its discretion in

---

[13]The District Court gave the following instruction:
>    This evidence concerns the defendant's
> actions while president of Johnston
> Laborator[ies] approximately three months
> before the date first charged in the indictment
> when the [PA DEP] decertified the defendant
> and his laboratory from conduct[ing]
> environmental testing of drinking water.
>    In that connection, let me remind you
> that the defendant, Edward Kellogg, is not on
> trial for committing any act that is not alleged in
> the indictment.
>    Accordingly you may not consider this
> evidence of the similar act as a substitute for
> proof that the defendant committed the crimes
> charge[d], nor may you consider this evidence
> as proof that the defendant has a criminal

allowing evidence of fraudulent acts to prove later knowledge and intent in the charged offenses.

**III.** *Sufficiency of the Evidence*

Finally, Kellogg argues that his conviction is not supported by substantial evidence. We apply "a particularly deferential standard of review when deciding whether a jury verdict rests on legally sufficient evidence." *United States v. Dent*, 149 F.3d 180, 187 (3d Cir. 1998) (citations omitted). We "must view the evidence in the light most favorable to the government, and will sustain the verdict if 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id.* (quoting *United States v.*

---

personality or a bad character.

Specifically, you may not use this evidence to conclude that because the defendant committed the other act, he must also have committed the acts charged in the indictment. The evidence of the other similar act was admitted for a much more limited purpose, and you may consider it only for that limited purpose.

*Voigt*, 89 F.3d 1050, 1080 (3d Cir. 1996)) (other citations omitted).

Kellogg argues that the government presented insufficient evidence of his specific intent to defraud, as required by the Federal mail fraud statute, 18 U.S.C. § 1341. *See United States v. Dobson*, 419 F.3d 231, 237 (3d Cir. 2005) (setting forth elements required to sustain conviction under 18 U.S.C. § 1341); *see also Copple*, 24 F.3d at 544 (3d Cir. 1994) ("The essential elements of the crime of mail fraud are 1) a scheme or artifice to defraud; 2) participation by the defendant with specific intent to defraud; and 3) use of the mail in furtherance of the scheme.").

After carefully considering the trial record, and mindful of the scope of our review, we are not persuaded that Kellogg has met the "very heavy burden" of demonstrating his claim of insufficiency of the evidence. *Dent*, 149 F.3d at 187 (citations omitted); *United States v. Gonzalez*, 918 F.2d 1129, 1132 (3d Cir. 1990). There is ample evidence in the

record[14] for a reasonable jury to conclude that Kellogg

intended to defraud Johnston Laboratories' customers by

substituting EPA Method 624 for EPA Method 601/602, by

sending false reports to customers stating that testing based on

EPA Method 601/602 had been performed, and by

[14]*See, e.g.,* trial testimony of Randy Haring, the president of Hydro-Analysis, who stated that he recalled a telephone conversation with Kellogg in which he told him that Hydro-Analysis could not perform EPA Method 601/602, and Kellogg agreed to have testing done using EPA Method 624 (Appx. 1650-51); trial testimony of Akhter Mehmood, a chemist who oversaw Hydro-Analysis' day-to-day operations, stating that he had a May 11, 1998 telephone conversation with Kellogg about a request for Hydro-Analysis to perform EPA Method 601/602 testing, and that he personally told Kellogg that Hydro-Analysis did not have the capability to perform this method, and that Kellogg gave him the authorization to do EPA Method 624 instead of 601/602 (Appx. 1245-48); trial testimony of Ronald Andrae, a chemist employed by Johnston Laboratories, stating that in 1998 he became aware that Hydro-Analysis was reporting testing by a method other than EPA Method 601/602, but that Johnston Laboratories' reports stated that EPA Method 601/602 was being used (Appx. 537); trial testimony of Tracy Buzalka, a microbiologist employed by Johnston Laboratories, stating that she noticed that Hydro-Analysis reported using EPA Method 624, but that Johnston Laboratories reported out EPA Method 601/602, and that she told Kellogg about the differences in the reports [Appx. 431-32].

subsequently billing customers for the EPA Method 601/602 tests without actually having performed them. Because there is evidence to support each of the elements of the charged offenses, Kellogg's assertions to the contrary are unavailing.

## CONCLUSION

For the reasons set forth, we will affirm the judgment of the District Court.

**ROTH**, Circuit Judge, CONCURRING:

I am pleased to join the majority in all but Section I.B of the opinion. The majority acknowledges that guilt-assuming hypotheticals may not properly be asked of opinion witnesses in every case. The majority holds that such a question was permissible in this case, however, based on a perceived distinction between reputation and opinion

-46-

character witnesses. The majority concludes that the question asked of Pennington (who offered both opinion and reputation testimony) was relevant and its hypothetical nature was clear, thereby assuaging any concern with respect to the presumption of innocence. I respectfully disagree. However, because the error in permitting the questioning was harmless, I concur in the result.

"'The principle that there is a presumption of innocence in favor of the accused is the undoubted law, axiomatic and elementary, and its enforcement lies at the foundation of the administration of our criminal law.'" *Taylor v. Kentucky*, 436 U.S. 478, 483 (1978) (quoting *Coffin v. United States*, 156 U.S. 432 (1895)). Because of the potential of guilt-assuming hypotheticals to impair this presumption, the majority of circuits have held that they are not permissible, whether asked of reputation or opinion witnesses. The distinction between reputation and opinion

testimony may relate to the probative value of a guilt-assuming hypothetical, but any such distinction does not affect how such questions impact the presumption of innocence. *See United States v. Oshatz,* 912 F.2d 534, 539 (2d Cir. 1990).

Contrary to the government's argument, the challenged cross-examination of Pennington posed a guilt-assuming hypothetical, even though the defendant's name was not mentioned. This hypothetical was directed to the crux of Kellogg's defense. Kellogg maintained that there was insufficient evidence that he had the intent to defraud required to convict under the mail fraud statute. In his defense, Kellogg relied in part on witness testimony to the effect that, while the Johnston Laboratories computer system for assigning method numbers to repeat customers was difficult to change, Johnston would never have intentionally reported the wrong methodology, as well as that the EPA Method 624

used by Hydro-Analysis was sophisticated and tested for essentially the same contaminants as EPA Method 601/602, the method that Johnston Laboratories reported to customers.

The question posed to Pennington referred, in contrast, to "a person who knows that a laboratory used one particular analytical method, but then . . . reports out a completely different analytical method on final reports of analysis to its customers . . .." In my view, this questioning was improper and should not have been permitted. It is not clear to me, as it is to the majority, that this guilt-assuming hypothetical was sufficiently hypothetical to be permissible.

Substantial other evidence supported a finding of guilt, however, such that the error in allowing the questioning of Pennington was harmless. As the majority explains in note 14, for example, multiple witnesses testified that Kellogg agreed to have Hydro-Analysis test using EPA Method 624,

and Johnston Laboratories employees testified to having conversations with Kellogg about the discrepancies in the reports sent to customers. In addition, numerous Johnston customers attested that they had received reports and invoices from Johnston stating that Method 601/602 had been used. Because I find that substantial other evidence renders the error in permitting the guilt-assuming hypothetical harmless, I concur in the result.