**UNITED STATES of America,
Plaintiff-Appellee,**

**v.**

**Miguel CANDELARIA–GONZALEZ and
Manuel Ledesma-Ruiz,
Defendants-Appellants.**

**No. 75–4013.**

United States Court of Appeals,
Fifth Circuit.

Feb. 18, 1977.

**292**

Joseph A. Morgan, Howard Jefferson Gibbs, El Paso, Tex., for Candelaria-Gonzalez.

Michael R. Gibson, El Paso, Tex., for Ledesma-Ruiz.

John E. Clark, U. S. Atty., San Antonio, Tex., Michael T. Milligan, Asst. U. S. Atty., El Paso, Tex., for plaintiff-appellee.

Before GOLDBERG, SIMPSON and GEE, Circuit Judges.

SIMPSON, Circuit Judge:

Appellants, Miguel Candelaria-Gonzalez (Candelaria) and Manuel Ledesma-Ruiz (Ledesma), were charged in a four count indictment with the following offenses: (1) conspiring to possess heroin with intent to distribute, in violation of Title 21, U.S.C., Section 846; (2) possessing heroin with intent to distribute, in violation of Title 21, U.S.C., Section 841(a)(1); (3) conspiring to import heroin, in violation of Section 21, U.S.C., Section 963; and (4) importing heroin, in violation of Title 21, U.S.C., Sections 952(a) and 960(a)(1). They were each found guilty as charged in a joint jury trial, and each was adjudged guilty and sentenced to twenty years confinement to be followed by a special parole term of twenty years.

In this appeal from their convictions, appellants claim that each of them was denied a fair and impartial trial, free from error in law, in violation of their Sixth Amendment rights. We determine that reversible error occurred at the trial and reverse both convictions.

The government's case against the appellants primarily rested upon the testimony of Ishmael Fuentes, an undercover agent for the federal Drug Enforcement Administration (DEA). He testified at trial that he was introduced to Ledesma by a confidential informant, and stated further that, after a period of undercover activities, he purchased heroin and cocaine from Ledesma. According to Fuentes, the purchase occurred when he took the contraband from a blue and white Chevrolet pickup truck located in the parking lot of the Martinique Lounge, in El Paso, Texas. Fuentes asserted that Ledesma gave him the keys to the pickup truck. Neither money nor contraband passed directly between the agent and the appellants, Fuentes stating that he was directed by Ledesma to leave the payment for the contraband in a red Chevrolet pickup truck also parked at the Martinique Lounge. No money was placed or found in the red pickup. Fuentes testified that he went through the motions of placing the money in the red pickup truck, but did not do so for fear of jeopardizing official government money. Candelaria was with Ledesma at the Martinique Lounge when the narcotics deal allegedly took place. Fuentes stated that Ledesma identified Candelaria as the person who had smuggled the drugs into the United States from Mexico. The government offered proof identifying Candelaria's deceased father as the registered owner of the blue and white Chevrolet pickup truck from which Fuentes stated he got the drugs. Shortly after agent Fuentes returned to appellants' table

in the Martinique Lounge, other DEA agents entered the lounge and placed the appellants and Fuentes under arrest.[1]

In his defense Ledesma denied selling any drugs to the DEA agent, Fuentes. He stated that he knew Fuentes as a person who posed as a building contractor. Ledesma was the owner of a heating and air conditioning business of considerable size. He stated that Fuentes contacted him regarding houses Fuentes proposed to build in El Paso, suggesting that Ledesma do the heating and air conditioning work for such houses. He related that during one of their conversations about these houses, Fuentes asked him to furnish Fuentes with drugs. According to Ledesma, he told Fuentes that he had nothing to do with drugs, and that he could only assist Fuentes with heating and air conditioning installations. He characterized Fuentes' story about the drug sale as a total fabrication. The other appellant, Candelaria, did not testify, but he offered character witnesses, as did Ledesma. The same attorney represented both defendants at trial. They have separate counsel on appeal.

The crucial issue for the jury in this case rested on whose testimony should be believed, that of appellant Ledesma or that of DEA agent Fuentes.

1.  Fuentes testified that he was arrested because he wanted to protect the informer, and he did not want to "blow" his cover.

2.  "Q. (Mr. Milligan—government counsel): Would his reputation with your firm be affected if he were convicted of trafficking in narcotics?
    A. (Mr. Russell, the witness): Yes, sir.
    MR. GIBBS (defense counsel): Objection, Your Honor.
    THE COURT: I'll overrule the objection."

3.  "Q. (Mr. Milligan) Okay. Now do you think his reputation would be affected if he were convicted of trafficking in narcotics?
    MR. GIBBS: Objection, Your Honor. Once again, same objection voiced because this Defendant, Ledesma, has the presumption of innocence with him. What the Prosecutor is doing is again trying to convict him.
    THE COURT: I'll overrule your objection.
    MR. GIBBS: Exception.
    THE COURT: You may have it.
    MR. MILLIGAN: May I restate the question?

Both appellants urge that error occurred in the admission of certain testimony over defense counsel's objections, and both contend that the court so mistreated defense counsel in the jury's presence as to require reversal.

We consider first Ledesma's contention that the district judge erroneously permitted grossly improper cross-examination of Ledesma's character witnesses. Several witnesses testified as to his general reputation for truth and veracity. The first such witness testified that such reputation was good. Government counsel on cross-examination asked if Ledesma's indictment would affect the witness's opinion of him and his reputation in general. Defense counsel objected, and the district judge ultimately sustained the objection, at the same time advising government counsel that it would be permissible to ask the witness if Ledesma's reputation *would* be affected *if* he were *convicted* of trafficking in narcotics. Government counsel posed this question to Ledesma's second character witness. The question was permitted over defense counsel's objection.[2] Two other character witnesses for Ledesma were asked the same question, and counsel objected in each instance. Once the objection to the question was overruled,[3] on the other occasion the objection was sustained.[4]

THE COURT: Yes, you may.
Q. Would his reputation, as far as you're concerned, be affected if he were convicted of trafficking in narcotics?
A. (Mr. Gonzalez, the witness): I wouldn't know how to answer that, I don't think."

4.  "Q. (Mr. Milligan) Now, since your knowledge of him and your opinion of him relates strictly to air conditioning, I take it the limited opinion you hold would not be affected if he were convicted of narcotics trafficking.
    MR. GIBBS: Your Honor, once again I have to object. The presumption of innocence is with this Defendant. He hasn't been convicted, and I don't think the Prosecutor has a right to assume in a question that he will be convicted. This jury—
    THE COURT: I'll sustain the objection. I think you've been over it. I think you've made your point."

Control of the cross-examination of character witnesses as well as others is largely within a trial court's discretion. See *Michelson v. United States*, 1948, 335 U.S. 469, 480, 69 S.Ct. 213, 220–21, 93 L.Ed. 168, 176. "Wide discretion is accompanied by heavy responsibility on trial courts to protect the practice from any misuse." *Id.*

■ The district judge below abused this discretion when he permitted the prosecution to ask these hypothetical questions on cross-examination. Once the defendant places his reputation in issue, the prosecution has wide latitude to pursue the reputation of the accused on cross-examination. *Id.* at 479, 69 S.Ct. at 220, 93 L.Ed. at 175–76; *Moore v. United States*, 5 Cir. 1941, 123 F.2d 207. Nevertheless reputation denotes the formation of definite opinions by the community. See *United States v. Lewis*, 1973, 157 U.S.App.D.C. 43, 482 F.2d 632; 5 *Wigmore, Evidence* § 1611 (Chadbourn Ed. 1974).

The nature of the questions put to Ledesma's witnesses by government counsel, however, was a far cry from any concept of formulated community opinion. Rather, the questions posed sought speculative responses resting upon an assumption of guilt. Government counsel asked if Ledesma's reputation *would* be affected *if* he *were* convicted of the alleged crime. These hypothetical questions struck at the very heart of the presumption of innocence which is fundamental to Anglo-Saxon concepts of fair trial. See *Gomila v. United States*, 5 Cir. 1944, 146 F.2d 372; *Little v. United States*, 8 Cir. 1937, 93 F.2d 401, 408. We think that the risk of prejudice to defendant's basic rights from such questions requires reversal. The questions put have no place in a criminal trial.

■ Testimony as to reputation should be, as the name indicates, based on repute, which is synonymous with hearsay. It is "established not by what one knows to be fact concerning another, but by what one has heard in the community about the person in question." (Citations omitted). *United States v. Fink*, 5 Cir. 1974, 502 F.2d 1, 5. See *Michelson v. United States, supra*, 335 U.S. at 477, 69 S.Ct. at 219, 93 L.Ed. at 174–75. Obviously the character witnesses offered by the appellant Ledesma had heard nothing in the community about his post conviction reputation when he had been convicted of nothing whatsoever. No one yet knew what people would say about him if he were convicted.[5]

■ Government counsel also asked, on cross-examination, whether it would be inconsistent with the witness's knowledge of Ledesma *if* a DEA agent testified that Ledesma was known as a major narcotics trafficker. After instructing counsel to rephrase his question, the district judge allowed it.[6] This type of questioning was beyond the scope of permissible interroga-

---

5. Character witnesses have been allowed to testify as to reputation existent prior to and not remote from the date of the offense. *See Bryant v. United States*, 5 Cir. 1919, 257 F. 378, 387. But, evidence of the accused's reputation in the community after the criminal charge has been made public are generally held inadmissible because such evidence might not be a trustworthy indication of the accused's character. *See United States v. Lewis*, 1973, 157 U.S.App. D.C. 43, 482 F.2d 622, 641; 5 *Wigmore, Evidence* § 1618 (Chadbourn Ed. 1974). Calling for a prediction of what the community might think of the accused *if* he were convicted sometime in the future is void of any trustworthiness whatever.

6. "Q. (Mr. Milligan) Okay. So if a D.E.A. agent were to testify that he has a reputation as one of the major narcotics traffickers in the Western—

MR. GIBBS: Your Honor, I respectfully object. He's speculating again. He said if a D.E.A. has testified and so on. This D.E.A. he's talking about is an accomplice in this case and tainted with this, I don't think he should be permitted to go into that.
THE COURT: I'll sustain the objection, the form in which it's asked. Ask it on an hypothesis, say assume a D.E.A. has that sort of testimony.

  .        .        .        .

Q. (Mr. Milligan) All right. Assuming that a D.E.A. agent with knowledge of Mr. Ledesma's reputation for a narcotics trafficker states he had a reputation for being one of the major narcotics traffickers in the Western United States, assuming an agent like that so testified, would that—that would not be inconsistent with your knowledge of him, would it?
A. (Mr. Lucke, the witness) That's right."

tion under *Michelson v. United States, supra,* and the Federal Rules of Evidence. The agent's testimony was raised to the status of accepted fact, and the presumption of innocence was destroyed in the process. See further, *Kotteakos v. United States,* 1946, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557. The convictions here are due to be reversed for the court's repeated allowance of inherently prejudicial cross-examination by the prosecutor.

With considerable justification the appellants urge also that the district judge's hostility toward their defense counsel, manifested on a number of occasions during the trial, prejudiced them in the eyes of the jury. The trial judge gratuitously disparaged counsel several times before the jury.

Indeed, the tone of the trial was set early on when the district judge sharply ruled on defense counsel's first objection. After the rule as to witnesses was invoked, counsel objected to Agent Fuentes, the government's principal factual witness, being allowed to remain at counsel table to assist the government. The district judge replied, "I have never heard of such an objection. Show me your authority for any such ridiculous assumption".[7] Other instances are cited when the district judge exhibited hostility toward the defense. He repeatedly corrected defense counsel in the presence of the jury, sometimes in an antagonistic manner.[8] Counsel was interrupted frequently during his direct examination of appellant Ledesma [9] and his character witnesses,[10] as

---

**7.** This court has previously recognized that such a comment is likely to discredit defense counsel in the minds of the jury. *See Zebouni v. United States,* 5 Cir. 1955, 226 F.2d 826. "In the administration of justice, the function of counsel is almost, if not quite, as essential and important as is that of the judge, and counsel, in the proper performance of his duty, is entitled to the courtesy and respect of the court." *Id.* at 827.

**8.** On one occasion government counsel objected because defense counsel referred to Agent Fuentes as a "co-conspirator". The following colloquy ensued when defense counsel tried to explain why he so described Agent Fuentes:

"MR. GIBBS: (defense counsel) No, there is no dispute, but as such his testimony would not have been accessible here unless he was actually a part of the conspiracy.

MR. MILLIGAN: (government attorney) No, Your Honor,—

THE COURT: That's not the law. Leave the law to me, will you? This is not—Go into the facts. I think the law is up to the Court. Don't tell the jury or me what the law is. That's up to the Court. You are invading my province. I'll instruct the jury as to the law. Cross-examine him on the facts of his testimony."

**9.** "Q. (defense counsel) Let me interrupt you now. You say you reached the point where he kept insisting that you could or would or could you get these drugs for him and you said—

THE COURT: Now wait a minute, this is very leading. I mean you are asking one question after the other. *The Rules of Federal Evidence effective July the 1st, and I did a State Bar paper on it* doesn't contemplate you leading your witness like this any more. You are asking two or three ques-

tions in one and asking for a yes or no answer.

MR. GIBBS: What I'm trying to do is bring him up to the point where something occurs. I can't do that if I ask him yes or no.

THE COURT: Why can't you? I tell you, Mr. Gibbs, *let me just give you one suggestion. This comes from a trial lawyer who has participated in over 3000 jury cases in a period of 30 years.* If you ask the witness how, when, why and where you will never lead him. "What happened?" "What did you do next?" That way you won't lead him." [Emphasis supplied]

The judge's assertions of his own expertise in the fields of evidence and trial procedure seem to us uncalled for.

**10.** "Q. Nine years. How—what would you term his reputation?

THE COURT: Wait just a minute. I think the way you've got to ask this, Mr. Gibbs, this is the way the rules contemplate it. "Are you acquainted with the reputation of this defendant for truth and veracity in the community for honesty and integrity and peaceful law-abiding citizen?" Whichever you want to prove, those are the three elements of your question.

MR. GIBBS: I accept that question, Judge.

Q. Can you answer that?

A. Yes, I was going to answer it awhile ago, and the only answer I can answer it is with my relationship with Johnny is—

THE COURT: That's a leading question, do you have an opinion? Just answer yes or no.

MR. GIBBS: Do you have an opinion?

THE COURT: Do you have an opinion?

Q. —Mr. Brandt?

A. Yes.

THE COURT: You have to answer the question. Now what's your opinion?

well as during cross-examination of government witnesses,[11] even though no objection

THE WITNESS: My opinion that he's a very honest upstanding—

THE COURT: You've got to answer good or bad.

THE WITNESS: It's very good.

Q. Now, when you say it's very good, would you—

THE COURT: You're not intending to embellish it. That's the rule, I mean.

MR. GIBBS: I think—

THE COURT: He said it's good.

MR. GIBBS: I stand corrected, Your Honor, and—

THE COURT: All right.

MR. GIBBS: I'm very happy to learn the rule, and it's helped me no end.

THE COURT: All right.

Q. But let me ask you, sir—

THE COURT: Another remark like that and you're going to be sorry.

MR. GIBBS: I apologize—

THE COURT: I consider that highly contemptuous on your part.

MR. GIBBS: I apologize, Your Honor. I was putting a question to the Court. You said I'm not entitled to embellish. Can I ask him his reputation which he just testified to is very good, is it excellent or is it outstanding?

THE COURT: I think the question has been answered, it's very good."

Defense counsel was again interrupted later in the trial when the court reprimanded him for referring to Appellant Ledesma by his first name:

"Q. And how often do you come in contact with Johnny?

THE COURT: Just a minute. You know the rules, I think, Mr. Gibbs. You're not entitled nor is anybody entitled to the liberty of disrespect of any witness by addressing him by his first name in this Court. Mr. Ledesma.

MR. GIBBS: As you wish, Judge.

THE COURT: Not as I wish. This is the Rules of Federal Procedure that apply to all cases. All defendants, irrespective, are entitled to the dignity and respect of being addressed as Mr. Ledesma. It's not as I please. It's what the rules require.

MR. GIBBS: This was not a sign of disrespect to Mr. Ledesma. I respect him as great as anybody in this courtroom.

THE COURT: I don't want you to call him by anything but his last name, and I want you—it preceded by Mister.

MR. GIBBS: I will. I'm pleased to comply with your rules, Judge.

THE COURT: Well, it's not my rules, but it is the rules, and it is a rule of this Court and of the Federal Procedure. Now follow it, please.

MR. GIBBS: Yes, sir. (To the Reporter) Now, sir, would you read the last question, please?

was heard from government counsel. Aside from the tendency to prejudice the defend-

THE COURT: No, of course. Restate your question. Please don't test my Court Reporter. Let's proceed. Ask the question. If it's important, I'm sure you'll remember it."

11. "MR. GIBBS: I'll withdraw that about the diamond ring, but he did say in answer to a question I just asked him, I said from your experience you know that these narcotic's dealers are not prone to accept a fellow that just walks in off the street or words to that effect.

THE COURT: He has answered your question by saying "I have studied, I try to get the vernacular and it is a part of my job in studying them that I am one of them in order to be able to act as an undercover agent." Now that's his answer. Isn't that right?

THE WITNESS: Yes, sir.

THE COURT: I don't understand—That's what he said.

MR. GIBBS: Well, what I'm trying to get at, I'm trying to show the improbability of these Defendants accepting a man that just walks off the street.

THE COURT: He hasn't said they were clowns or dumb or stupid. He said as an experienced, well trained and I think you brought this out yourself, dedicated, highly trained undercover agent and that he has to sell himself. Isn't that what he said?

MR. GIBBS: I didn't say dedicated.

.     .     .     .     .

THE COURT: He is an undercover agent, you have established that. You have established that he is experienced in the field and he has handled I think 29 cases. A part of his job, his training and education is to sell himself as an undercover agent, as a dealer in narcotics to the various Defendants. Now, isn't that where we are?"

Later in this examination, defense counsel was again interrupted.

"Q. All right. I notice an unusual thing in connection with you when you are on the stand—

THE COURT: Wait just a minute. You are testifying now. We don't care whether you have noticed an unusual thing or not. Just ask this gentleman questions and quit making statements and characterizations. The point you are trying to make here is that he has a job to do and if he actually does make cases he gets certain credit for it.

MR. GIBBS: I have passed that by and I have something else to ask him now when Your Honor thought I made an objectionable statement.

ant and his counsel before the jury, the effort of a defense attorney to discharge his responsibility to his client is seriously handicapped by such behavior on the trial judge's part. Other instances are cited, but the examples quoted show substantial ground for the contention that the district judge, by his antagonism toward defense counsel and his continuing interference in the trial, abused his discretion and so prejudiced the jury against defendants as to require reversal.

■ A trial judge must exhibit neutrality in his language and in the conduct of a trial before a jury. He should avoid any possibility of prejudicing the jury through his criticism of or hostility toward defense counsel. *United States v. Lanham,* 5 Cir. 1969, 416 F.2d 1140; *Travelers Insurance Co. v. Ryan,* 5 Cir. 1969, 416 F.2d 362; *United States v. Carrion,* 9 Cir. 1972, 463 F.2d 704. Of course a trial judge is not required to remain silent and passive throughout a jury trial. To the contrary, he has a duty "to participate directly in the trial, and to facilitate its orderly progress and clear the path of petty obstructions. It is his duty to shorten unimportant preliminaries, and to discourage dilatory tactics of counsel." *Adler v. United States,* 5 Cir. 1910, 182 F. 464, 472. *See Bursten v. United States,* 5 Cir. 1968, 395 F.2d 976, cert. denied 409 U.S. 843, 93 S.Ct. 44, 34 L.Ed.2d 83. But in performing this duty he must make every effort to preserve the appearance of strict impartiality. "The opinion of the judge, on account of his position and the respect and confidence reposed in him and in his learning and assumed impartiality, is likely to have great weight with the jury, and such fact of necessity requires impartial conduct on his part." *Gomila v. United States,* 5 Cir. 1944, 146 F.2d 372, 374. See *United States v. Lanham, supra; Travelers Insurance Co. v. Ryan, supra; Hunter v. United States,* 5 Cir. 1932, 62 F.2d 217. "[T]he judge is a figure of overpowering influence, whose every change in facial expression is noted, and whose every word is received attentively and acted upon with alacrity and without question." *Travelers Insurance Co. v. Ryan, supra,* 416 F.2d at 364. See *Quercia v. United States,* 1933, 289 U.S. 466, 53 S.Ct. 698, 77 L.Ed. 1321.

In the trial of this case, the judge made no effort to conceal his annoyance and impatience with defense counsel's performance. He was swift to criticize defense counsel in front of the jury. At times, counsel was directly ridiculed. Most of the judge's interruptions came without prompting or objection by government counsel. Granting to a trial judge considerable freedom to control a trial's progress, "he must not forget that the jury hangs on his every word and is most attentive to any indication of his view of the proceedings. Thus repeated indications of impatience and displeasure of such nature to indicate that the judge thinks little of counsel's intelligence and what he is doing are most damaging to a fair presentation of the defense." *United States v. Ah Kee Eng,* 2 Cir. 1957, 241 F.2d 157, 161.

Even if the judge's disapproval was occasionally warranted by defense counsel's conduct, we find slight, if any, justification in the record for the judge's sarcasm, his frequent interruptions and his antagonistic comments in the jury's presence. In a case of this nature, where determination of guilt or innocence rests largely on whether the jury credits the testimony of the chief government witness or that of the defendants, avoidance of the appearance of bias by the trial judge takes on added importance. The conduct of the trial as a whole must be scrutinized carefully. *United States v. Grunberger,* 2 Cir. 1970, 431 F.2d 1062. Here, we view as a serious impropriety the trial judge's failure to preserve an appearance of impartiality.

■ But we base our decision to reverse on the conduct of the trial as a whole. We do not find it necessary to decide whether the trial judge's behavior standing alone was sufficiently prejudicial to require re-

---

THE COURT: He said some are armed and so they have a policy when they make an arrest for him to draw his gun first to be sure that there is no gun play. Is that what your testimony is?"

versal. *United States v. Diharce-Estrada,* 5 Cir. 1976, 526 F.2d 637. The grossly prejudicial cross-examination of the appellants' character witnesses, considered in conjunction with the district judge's mistreatment of defense counsel, resulted in failure to accord a fair trial to these appellants.[12]

REVERSED and REMANDED.

**12.** Ledesma also contends that the district court erroneously refused to allow his cross-examination of government witnesses concerning the identity of the confidential informant. This contention lacks merit. The informant in this case played no part in the offense charged or in appellant's subsequent arrest. It was thus an impossibility for the informer to possess facts relevant or helpful to appellant's defense. See *Roviaro v. United States,* 1957, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639.