IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

November 23, 2009

Charles R. Fulbruge III
Clerk

No. 08-60577

UNITED STATES OF AMERICA

Plaintiff - Appellee

v.

JOHN H. DILLARD

Defendant - Appellant

Appeal from the United States District Court
for the Southern District of Mississippi
USDC No. 5:07-CV-17

Before JONES, Chief Judge, and GARZA and STEWART, Circuit Judges.

PER CURIAM:[*]

Defendant-Appellant John H. Dillard ("Dillard") appeals his conviction for conspiracy to distribute crack cocaine along with two substantive counts for drug trafficking. Finding no reversible error in his conviction, we affirm.

**I.**

Michael Tyler ("Tyler") was a major crack dealer in Vicksburg, Mississippi. Dillard was accused of being involved in Tyler's drug organization and was indicted, along with eight other defendants, by a federal grand jury on May 23,

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

1

2007. The indictment charged the various defendants with numerous drug trafficking offenses, including conspiracy to distribute more than 50 grams of crack cocaine in violation of 21 U.S.C. § 846 and 18 U.S.C. § 2, and various individual counts of distributing more than five grams of crack cocaine in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2.

Jury selection in Dillard's trial began on March 4, 2008. Dillard, an African-American male, exercised eight of his first nine peremptory challenges on white males. The Government objected under *Batson v. Kentucky*, 476 U.S. 79 (1986), arguing that Dillard was using his challenges in a discriminatory manner to systematically exclude white males from the jury. The district court conducted a *Batson* hearing and concluded that Dillard was exercising his peremptory challenges in a purposefully discriminatory fashion. Consequently, Dillard's defense counsel was directed to accept two white males back onto the jury.

The case against Dillard proceeded to trial. In its case-in-chief, the Government offered three audiotapes and their companion transcripts as evidence that purportedly connected Dillard to Tyler's drug organization. These audiotapes were admitted into evidence over Dillard's objections.

After the Government rested its case-in-chief, Dillard put on his own evidence comprised primarily of character witnesses who testified to his reputation in the community as a law-abiding citizen. During the cross-examination of the first character witness, the Government sought to question the witness about Dillard's misdemeanor conviction for possession of a crack pipe. Over Dillard's objection, the court permitted the Government to proceed with its cross-examination.

Following trial, the jury convicted Dillard and he was sentenced to 120 months imprisonment for the conspiracy charge and to concurrent terms of 60 months each for the drug trafficking charges.

## II.

Dillard argues that the district court committed reversible error in its handling of the Government's *Batson* claim. Specifically, Dillard contends that the district court committed legal error by imposing on him a burden of persuasion as to the validity of his peremptory strikes when the United States Supreme Court has required only that he present a facially valid, race-neutral explanation for exercising such a strike. Dillard also complains that by requiring that his proffered explanation be persuasive, the district court relieved the Government of its obligation to prove that his exercise of his peremptory strikes was pretextual.

### A. Standard of Review

We review a district court's *Batson* determination for clear error. *United States v. Bentley-Smith*, 2 F.3d 1368, 1372 (5th Cir. 1993). A trial court's findings are clearly erroneous when evidence exists to support them but the appellate court, after reviewing the entire record, is left with "'definite and firm conviction that a mistake has been committed.'" *Anderson v. City of Bessemer*, 470 U.S. 564, 573-74 (1985) (citation omitted).

### B. *Batson* Challenges

The Supreme Court has outlined a three-step process for determining whether peremptory challenges have been applied in a discriminatory manner. Once the opponent of a peremptory challenge has made out a *prima facie* case of racial discrimination (step 1), the burden of production shifts to the proponent of the strike to come forward with a race-neutral explanation (step 2). If a race-neutral explanation is tendered, the trial court must then decide whether the opponent of the strike has proved purposeful discrimination (step 3). *See Batson*, 476 U.S. at 93-98; *Georgia v. McCollum*, 505 U.S. 42 (1992) (extending *Batson* framework to criminal defendant's discriminatory use of peremptory strikes).

3

The ultimate burden of persuasion in the *Batson* framework always lies with the party making the claim of purposeful discrimination. *Bentley-Smith*, 2 F.3d at 1373. In the instant case, Dillard argues that the district court erred by improperly shifting the burden of persuasion onto him and requiring him to prove that the challenges were not racially motivated.

We cannot agree. Contrary to Dillard's suggestions, an examination of the whole transcript reveals that the district court correctly applied the three-step *Batson* framework. During the voir dire process, Dillard exercised eight of his first nine peremptory challenges on white males. At that point, the following colloquy ensued:

> GOVERNMENT: Your Honor, we would just ask for an explanation. I don't know whether the court wants to address this now or as far as some of the defense challenges.
>
> COURT: There's a clear pattern of excusing white males, Counsel. I'm not going to do it unless you give me a race-neutral reason. You have to give me a race-neutral reason . . . .

The court accepted six of Dillard's challenges as race-neutral but implicitly found that two of them were pretextual:

> COURT: Mr. B.M.[1] the defense says, was not attentive, I found Mr. B.M. to be attentive. I'm not going to let that challenge stand. Because there's a clear pattern of excluding white males.
>
> COURT: Mr. M.D., a hospital pharmacist that the defense said would be too preoccupied with his business and was not attentive. I do not find this to be so. I find to fit into the pattern of excusing white males. I will not let Mr. M.D. be excused for the reasons stated, which is a clear pattern here and the reasons given is not a race neutral reason.

---

[1] In the interest of protecting the privacy of the jurors, we refer to them by their initials.

The court then turned to the remedy for the violation:

COURT: Now, what I'm going to do is I'm not going to let the defense excuse Mr. M.D. for the reason that I have already stated and the other one that I'm not going to let defense excuse is Mr. B.M. For the same reason as to both of these. The defense simply said these two jurors were not attentive. I will allow the defense to excuse them but for the fact that it clearly [sic] a pattern of excusing every white juror, every white male juror that came to the defense. And that's the whole purpose of the *Batson* rule and *McCullom* [sic] and all other cases. Let's go back over it. What do you want to do about it Mr. Anderson [Defense Counsel]? I'll let you decide how you want to handle it.

DEFENSE COUNSEL: I'm not sure I understand where that leaves us. We have —

COURT: Where it leaves us is that I will let you review what you've done and go back and re-do the entire process, revisit the jurors. We can start from the very beginning, if you like. And I'm not going [sic] make you reinstate Mr. M.D. I'm not going to make you reinstate Mr. B.M. But what I am going to do is I'm not going to let you excuse every white male when there's no go good race-neutral reason for it just as I wouldn't allow it if there was a situation where the government is excusing every black on this jury, every African-American on the jury. I wouldn't allow it.

DEFENSE COUNSEL: If I understand, for example, Judge, if I accept Mr. M.F.

COURT: You accept Mr. M.F., if you accept Mr. M.F, you would be accepting a white male.

DEFENSE COUNSEL: And I can at this point still strike Mr. M.D.?

COURT: If you accept, Mr. M.F., you have accepted a white male. In other words, you are going to have to do that to two of them, though.

DEFENSE COUNSEL: I understand.

COURT: Yes, sir. You had rather accept Mr. M.F.?

DEFENSE COUNSEL: We'll accept Mr. M.F.

COURT: All right, Mr. M.F. is going to be juror number . . . six . . . Which other one are you going to accept, Counselor?

DEFENSE COUNSEL: Let me look here just a moment.

COURT: Take your time. Take your time.

DEFENSE COUNSEL: We'll accept Mr. B.A., juror number 19.

COURT: All right.

Clearly, the district court found that the Government made a *prima facie* showing of discrimination so we focus our attention on step 2 and step 3 of the *Batson* framework. At the second stage of the *Batson* framework, where the party accused of discrimination must articulate a race-neutral explanation for the peremptory challenges, "the issue is merely the facial validity of the explanation." *Bentley-Smith*, 2 F.3d at 1373. While at the third stage of the *Batson* framework, "the decisive question will be whether a proffered race-neutral explanation should be believed." *Id*. at 1374-75. At step 3 of the process, "there will seldom be any evidence that the claimant can introduce — beyond arguing that the explanations are not believable or pointing out that similar claims can be made about non-excluded jurors . . . ." *Id*.

In the instant case, a review of the record convinces us that the district court did not shift the burden of persuasion to the defendant. The district court listened to the proffered explanations for excusing Jurors B.M. and M.D. and concluded that defense counsel's explanations for exercising the peremptory strikes were pretextual. Dillard assumes that the trial court did not employ the proper three-step *Batson* process because the prosecution was not required to make some explanation or argument after he proffered a race-neutral explanation for the strike.

6

But such argument is unnecessary if it is obvious from the explanation that it is pretextual. Dillard incorrectly assumes that the process of analyzing *Batson* claims stops at step two: that if the proponent of the strike articulates any reason whatsoever, the trial court is forbidden from rejecting that reason as pretextual. Instead, where, as in the instant case, the defendant's reasons for challenging a juror are facially race-neutral, step 3 of *Batson* requires the court to analyze whether the proffered race-neutral explanation should be believed. *Bentley-Smith*, 2 F.3d at 1373. Believability "is a question of fact which turns heavily on demeanor and other issues not discernable from a cold record, such that deference to the trial court is highly warranted." *United States v. Williams*, 264 F.3d 561, 572 (5th Cir. 2001) (internal citations omitted). Here, it is evident from a reading of the record that the district court closely observed the demeanor of the prospective jurors during the voir dire and saw no indication that they were inattentive. As a result, we can infer that in making its believability determination as required by step 3 of *Batson*, the district court did not need any additional explanation or argument as to why these explanations were pretextual.

In sum, Dillard's argument that "[t]he district court in this case terminated the *Batson* analysis at step 2, never requiring the Government to meet its ultimate burden of persuasion regarding prohibited racial motivation for the strikes by Dillard" has no merit. The record reveals that the district court in this case did exactly what *Batson* requires — it examined the circumstances surrounding the exercise of the strike, including the defense counsel's reasons, and made the ultimate credibility call about whether they were legitimate or pretextual.

## III.

A. Standard of Review

Dillard presents several challenges to evidence admitted during his trial. We review the district court's evidentiary ruling for abuse of discretion. *United States v. Ramirez*, 174 F.3d 584, 589-90 (5th Cir. 1999). This review, however, is subject to harmless error analysis. *United States v. Morgan,* 505 F.3d 332, 339 (5th Cir. 2007).

B. Admissibility of the Recorded Conversations

Dillard challenges three audiotapes admitted during his trial which purportedly connect him to Tyler's drug operation. Government Exhibit 4 ("G-4"), the audiotape of an alleged drug transaction on August 14, 2003, and its companion transcript, Government Exhibit 4a ("G-4a"), originated from a body wire on a confidential informant who was working with agents involved in investigating Tyler's drug operation. These agents had the informant call Tyler to arrange a drug deal. Shortly after the confidential informant placed the call, Vicksburg Police Officer DeWayne Smith ("Smith") saw Dillard drive up to the informant and heard the informant give Dillard money for drugs. G-4 and G-4a were introduced and played for the jury. Smith, who was present when the recordings were made and who was familiar with the parties' voices, testified that the tape and transcript accurately reflected the conversation he overheard. Furthermore, the identity of the confidential informant and Dillard on the audiotape was established by Keafur Wallace who knew Dillard for five years. Dillard objected to the introduction of G-4 and G-4a, claiming that there was no proper authentication of the voices on the audiotape by someone with knowledge of the conversation. He also claimed that admission of the exhibits violated his Sixth Amendment right to confront the witnesses against him since the informant did not testify at trial.

8

Government Exhibit 5 ("G-5") and its accompanying transcript, Government Exhibit ("G-5a") was an audiotape of a conversation between the confidential informant and Tyler, which was made shortly after Dillard delivered the crack cocaine to the informant in the August 14, 2003 drug sale.

After the August 14, 2003 drug sale, the agents had the informant telephone Tyler to complain about being "shorted" on the deal. Vicksburg Police Officer Bobbie Stewart ("Stewart") along with other agents listened to the informant's side of the conversation and recorded it. Stewart, who had known Tyler for over ten years, verified that Tyler's voice was the one talking to the informant. At trial, Stewart testified that the tape and transcript accurately reflected the conversation he overheard. Dillard asserted that G-5 and G-5a should not have been admitted because they were not authenticated and violated his Sixth Amendment right to confront the witnesses against him since the informant did not testify at trial.

When seeking to introduce a sound recording in a criminal prosecution, the Government bears the burden of going forward with foundation evidence demonstrating that the recording as played is an accurate representation of the conversation or other sounds at issue. *United States v. Stone*, 960 F.2d 426, 436 (5th Cir. 1992). Under Federal Rule of Evidence ("Rule") 901, "the requirement of authentication is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." FED. R. EVID. 901(a); *United States v. Lance*, 853 F.2d 1177, 1181 (5th Cir. 1988). To illustrate acceptable means of authenticating evidence, Rule 901(b) lists testimony of a witness with knowledge and, for identifying a voice, an "opinion based on hearing the voice at any time under circumstances connecting it with the alleged speaker." FED. R. EVID. 901(b)(1), (5); *Lance*, 853 F.2d at 1181.

Here, the district court did not abuse its discretion when it concluded that G-4/G-4a and G-5/G-5a were properly authenticated. The voices on the audiotapes and the accompanying transcripts were properly authenticated by law enforcement agents who monitored the conversations as they were occurring and who were familiar with the voices of the participants in the conversations.

Dillard also argues that the admission of G-4/G-4a and G-5/G-5a violated the Confrontation Clause of the Sixth Amendment. We review a Confrontation Clause challenge *de novo*. *United States v. Alvarado-Valdez*, 521 F.3d 337, 341 (5th Cir. 2008). Such claims, however, are subject to harmless error review. *Id*.

In *Crawford v. Washington,* 541 U.S. 36 (2004), the Supreme Court explained that out-of-court statements of a witness which are testimonial in nature are barred under the Confrontation Clause of the Sixth Amendment, unless the declarant is shown to be unavailable to testify and the defendant had a prior opportunity to cross-examine the witness. *Id*. at 54-59. In *Crawford*, the Court declined to define "testimonial," but noted that a testimonial statement includes, at a minimum, prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and . . . police interrogations." *Crawford*, 541 U.S. at 68-69.

Recently, in *Melendez-Diaz v. Massachusetts*, __ U.S. __, 129 S. Ct. 2527, 1949, 174 L. Ed. 2d 314 (2009), the Supreme Court opined that for a statement to be "testimonial" within the meaning of *Crawford*, it must have been made "under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Id*. at 2532. In *Melendez-Diaz*, the Supreme Court held that certificates of laboratory analysis asserting that material seized by police and connected to the defendant was cocaine of a certain quantity was testimonial in nature because they were prepared specifically for use at petitioner's trial. *Id*. at 2540 ("Whether or not

10

they qualify as business or official records the analysts' statements here —prepared specifically for the use at petitioner's trial—were testimony against petitioner and the analysts were subject to confrontation under the Sixth Amendment."). Specifically, the Court found that the certificates of analysis were more appropriately described as affidavits and fell within the "core class of testimonial statements" covered by the Confrontation Clause. *Id*. at 2532. (internal citation omitted). Therefore, the Court concluded that unless the analysts were unavailable to testify at trial and the defendant had been afforded a prior opportunity to cross-examine them, the Confrontation Clause required that the prosecution call the analysts to testify. *Id*.

Unlike *Melendez-Diaz*, the present case does not involve laboratory certificates, nor does it involve hearsay admitted through affidavits. Nevertheless, G-4 and G-4a do pose Confrontation Clause issues. In G-4 and G-4a the informant, on more than one occasion, called out Dillard's name, testifying in effect "This is John Dillard I am speaking with here." While the admission of G-4 and G-4a may have violated Dillard's Sixth Amendment rights, given the overwhelming nature of the evidence against Dillard any error in admitting G-4 and G-4a was harmless. Dillard was observed conducting the drug transaction, which is the subject of G-4 and G-4a, by a law enforcement officer who was familiar with his voice and able to identify it on the audiotape. Under *Melendez-Diaz*, G-5 and G-5a may pose a Confrontation Clause issue because they were prepared "specifically for use at the petitioners trial," but because of the overwhelming evidence against Dillard, described above, any error in their admission was harmless.

Lastly, the Government offered another audio recording, Government Exhibit 23 ("G-23") and its companion transcript, Government Exhibit 23a ("G-23a"), into evidence. The conversation in this exhibit is between Tyler and

11

Marinita Bernard ("Bernard"), concerning the arrest of Bernard's boyfriend Jeff Brown ("Brown"), one of Tyler's drug associates. The conversation contained comments made by Tyler to Bernard that "we all know what we are doing" (the "we" comment) and that it comes with the danger of arrest. Tyler advised Bernard that anyone arrested should simply do their prison time without cooperating with officials. Dillard asserts that the "we" comment made by Tyler is irrelevant and unfairly prejudicial since there is an absence of proof of a connection between him and the conspiracy which the Government says the tape helps to establish. Dillard also asserts that G-23/G-23a should not have been admitted because it did not record co-conspirators' statements since Bernard was not a named co-conspirator of Tyler or Dillard.

Rule 402 provides that "[a]ll relevant evidence is admissible," except as otherwise excluded by the Constitution, law, or other rule of evidence. FED. R. EVID. 402. Rule 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." FED. R. EVID. 401. Rule 403 limits the admissibility of relevant evidence, explaining that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . ." FED. R. EVID. 403.

Rule 801(d)(2)(E) allows admission of co-conspirator's statements made "during the course of and in furtherance of the conspiracy." *See Bourjaily v. United States*, 483 U.S. 171, 178-79 (1987). "Efforts to conceal an ongoing conspiracy obviously can further the conspiracy by assuring that the conspirators will not be revealed and the conspiracy brought to an end." *United States v. Phillips*, 219 F.3d 404, 419 (5th Cir. 2000). Though Rule 801(d)(2)(E) requires that both the declarant (Tyler) and the party against whom the

statement (Brown and Dillard) is offered be members of the conspiracy, there is no requirement that the person to whom the statement is made also be a member (Bernard). *See United States v. Means*, 695 F.2d 811, 818 (5th Cir. 1983).

In this case, the evidence adduced at trial established that Brown and Dillard were members of Tyler's ongoing drug organization. A reasonable interpretation of the conversation between Tyler and Bernard was that it was in furtherance of the conspiracy involving Tyler, Brown, and Dillard to persuade Brown, through his girlfriend Bernard, to keep his mouth shut and do his time. Therefore, we conclude that the requirements of Rule of 801(d)(2)(E) were met. Similarly, as the district court recognized, the "we" comment by Tyler could reasonably be inferred to refer to the participants in the conspiracy, and based on the time frame of the recorded conversations, that would include Dillard. Therefore, G-23/G-23a was relevant and probative to establish Dillard's participation in Tyler's ongoing drug organization and not unfairly prejudicial.

In sum, the trial court did not abuse its discretion by permitting the audiotapes into evidence.

## IV.

A. <u>Standard of Review</u>

Lastly, Dillard argues that on cross-examination the prosecution should not have been allowed to question Yolande Robbins ("Robbins"), his character witness, about specific bad acts and to ask speculative questions. This court reviews a trial court's decision to permit a certain line of cross-examination for abuse of discretion. *United States v. Smith-Bowman*, 76 F.3d 634, 636 (5th Cir. 1996).

B. <u>Cross Examination of Defendant's Character Witness</u>

If the defendant in a criminal trial puts on proof of his own good character, the prosecution may rebut this evidence by cross-examining the defendant's character witness. FED. R. EVID. 405(a). The prosecutor may do this by asking the witness about specific instances of bad conduct by the defendant. *See, e.g.*, *United States v. Wells,* 525 F.2d 974, 976 (5th Cir. 1968) ("Once a witness has testified concerning a defendant's good character, it is permissible during cross examination to attempt to undermine his credibility by asking him whether he has heard of prior misconduct of the defendant which is inconsistent with the witnesses' direct testimony."). There are two limitations to this type of cross-examination. First, the prosecution must have a good faith factual basis to believe that the defendant committed the bad act and second, the incidents must be relevant to the defendant's character traits that are testified to by the character witness. *See Michelson v. United States*, 335 U.S. 469, 481 n.18 (1948), *United States v. Nixon*, 777 F.2d 958, 970 (5th Cir. 1985).

Under Rule 405(a), the district court did not abuse its discretion when it allowed cross-examination of Dillard's character witness on specific acts of conduct. The Government had a good faith factual basis to believe that Dillard committed the prior misconduct since he pled guilty to possession of the crack pipe. Second, the incidents that the Government questioned Robbins about were relevant to the character traits that she testified to. On direct examination, Robbins was asked, "Have you had the occasion to become familiar with John Dillard's reputation in the community for being a law-abiding citizen?" Robbins testified, "I don't know of any incident in which John has not been law abiding or has been accused of any action that was not law abiding." Robbins made a broad pronouncement that Dillard was law-abiding, and as a result the Government had the right to question her concerning that statement.

14

To bolster his argument that the Government asked questions of his character witness that sought speculative responses resting upon an assumption of guilt Dillard relies upon *United States v. Candelaria-Gonzalez*, 547 F.2d 291 (5th Cir. 1977). In *Candelaria-Gonzalez*, a defendant on trial for drug trafficking called a character witness to testify as to his reputation for truthfulness. *Id.* at 293. On cross-examination, the prosecutor asked the witness if the defendant's reputation "would be affected if he were convicted of trafficking in narcotics." *Id.* In reversing the conviction, this court held that the question was improper because it "sought speculative responses resting upon an assumption of guilt" to the very charges for which the defendant was on trial. *Id.* at 294.

In contrast, in *United States v. Smith-Bowman*, 76 F.3d 634, 635 (5th Cir. 1996), the defendant was on trial for mail fraud charges related to her use of a Red Cross credit card for personal charges. Over objection, the trial court permitted the prosecutor to ask the defendant's character witnessess: "Have you heard that this defendant took an American Express credit card and went to the La Quinta Inn and rented a room in the name of Judy Walker so she could have a rendevous with her boyfriend?" and "Have you heard that this defendant took an American Express credit card and bought jewelry for herself?" *Id.* at 636. This court noted that the questions in *Smith-Bowman* were distinguishable from those in *Candelaria-Gonzalez* because they did not assume Smith-Bowman's guilt. *Id.* at 636.

In the instant case, on cross-examination, the Government asked the witness if her opinion about Dillard would change if she knew he had pled guilty to being in possession of a crack cocaine pipe in February 2004. Unlike in *Candelaria-Gonzales*, the Government's questions did not involve the very charges for which Dillard was on trial. Therefore, the district court did not

15

abuse its discretion by permitting the Government to question Dillard's character witness as it did.

## V.

For the reasons stated above, Dillard's conviction is affirmed.