Filed 4/13/21  P. v. Cordova CA4/2

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION TWO

THE PEOPLE,

     Plaintiff and Respondent,

v.

ERIK MICHAEL CORDOVA,

     Defendant and Appellant.

E073199

(Super.Ct.Nos. SWF1600673 & SWF1807161)

OPINION

APPEAL from the Superior Court of Riverside County.  Michael B. Donner, Judge.  Affirmed.

Darryl L. Exum for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson, Allison V. Acosta and Kristine A. Gutierrez, Deputy Attorneys General, for Plaintiff and Respondent.

1

Defendant and appellant Erik Michael Cordova fathered nine children with two women. For many years, he molested four of his six daughters. On May 6, 2019, a jury convicted him of 15 counts of lewd acts on a child under 14 years old (Pen. Code, § 288, subd. (a)) and six counts of forcible lewd acts on a child (Pen. Code, § 288, subd. (b)(1)). The jury also found that defendant committed these offenses against more than one victim. (Pen. Code, § 667.61, subd. (e)(4), Stats. 2018, ch. 423, § 68, eff. Jan. 1, 2019, former § 667.61, subd. (e)(5).) He was sentenced to an indeterminate term of 315 years to life.

On appeal, defendant raises various challenges to the trial court's evidentiary rulings and his counsel's assistance. We reject his challenges and affirm.

## I. PROCEDURAL BACKGROUND AND FACTS

### A. *Background.*

Defendant was in the business of "mining and marketing gemstones." He has nine children from two different wives, J. and S. In 1989, defendant began a relationship with J. In 1993, he began a relationship with S. In 1994, J. gave birth to Sa. and defendant told J. about his relationship with S. The families lived in two separate, but adjacent, houses in Torrance. Defendant and J. have five children: three sons, including M., and two daughters, including Jane Doe 2 (L.C., born Oct. 1996). Defendant and S. have four daughters: Jane Doe 1 (R.A., born Feb. 1995), Jane Doe 4 (C.C., born Dec. 1999), Jane Doe 3 (M.C., born Oct 2001) and A. Defendant married J. in 1997. By 2002, the families moved to Murrieta and lived in the same house. Shortly thereafter, in 2004, J. and her children moved out.

In 2009, defendant, S. and their children moved to Temecula. By 2013, defendant and J.'s divorce had become final, and defendant married S. Three years later, defendant was arrested, and S. divorced him.

*B. The Prosecution's Case.*

*1. Molestation involving L.C. (Jane Doe 2).*

Defendant began molesting L.C. when she was eight or nine years old, shortly after they moved to Murrieta, and continued until she was 16 years old. Sometimes he gave her alcohol and showed her pornography. He touched and massaged her breasts and genitals, made her touch and rub his penis and, sometimes, he ejaculated in her hand. He also made her orally copulate him, and he digitally penetrated her vagina while rubbing his penis. Defendant threatened that she would not be able to see her half sisters again if she did not comply. She did not tell anyone about the abuse because she was afraid she would be taken away from her mom and family.

L.C.'s brother, M., testified that one time, in the middle of the night, he saw defendant kneeling by L.C., who was on the couch, with his hand near her. Defendant yelled at M. to go to sleep.

*2. Molestation involving R.A. (Jane Doe 1).*

In 2000, defendant began molesting R.A. when she was five years old. He began by massaging her back, buttocks, and genitals, and later progressed to having her masturbate or orally copulate him. The abuse continued until she moved out of the house when she was 17. The abuse made R.A. angry, and she and defendant would argue a lot. She did not tell anyone about it because she was afraid. Defendant told her that if she

3

told anyone about the abuse, her "siblings would be put into foster care and [her] mom would be deported[1] and [she] would never see [her] family again."

### 3. Molestation involving C.C. (*Jane Doe 4*).

Defendant began molesting C.C. when she was eight or nine years old, and the family was living in Temecula. He massaged her back down to her buttocks. When she was in the sixth grade, defendant, who was wearing boxers, grabbed her and pushed her body against his body, and rubbed her chest and stomach. She did not tell anyone because she was afraid she and her siblings would be placed in foster care since her mother could not support them, and C.C. did not think her mother was eligible for social services as "she was here undocumented." Less than a year later, M.C. told C.C. and M. that she (M.C.) had been abused. M. did not believe it, but C.C. also disclosed that she had been abused. They agreed to keep it a secret so they would not be separated.

In 2015, C.C. told her mother that defendant had molested her. S. told C.C. not to tell anyone, and S. did not file a report with the authorities. Also in 2015 or 2016, C.C. told her boyfriend that defendant had touched her inappropriately. He told his aunt, a therapist, who spoke to C.C. and pressured her to call child protective services (CPS).

---

**1** R.A.'s mother, S., is from Austria. She came to the United States in 1993 as a nanny. She briefly returned to Austria but reentered the United States in 1999 on a tourist visa. She stayed past the expiration of her visa and became undocumented. In 2016, R.A. sponsored S. and initiated an application for her to get a green card, which was issued to her in June 2017.

### 4. Molestation involving M.C. (*Jane Doe 3*).

When M.C. was eight years old and living in Temecula, defendant rubbed her chest under her shirt while they watched a movie. When she tried to get away, defendant said, "'No. Be quiet. Stay here.'" When she was in the fourth or fifth grade, he walked into her bedroom and wanted her to touch his penis. She refused, and he told her to lay on the bed. He grabbed her chest under her shirt for about 10 minutes. M.C. wrote about the incident in her journal. About one year later, she disclosed the incident to M. and C.C. In 2012, S. found M.C.'s note in her journal, and they discussed it. M.C. had written, "This is about the time when Dad asked me to touch his thingy. I told [C.C.] and [M.] about it [¶] . . . [¶] [b]ut no one believes me." When S. confronted defendant, he said that it was "a one-time thing" and "nothing happened." S. discarded the note and did not tell anyone because she was in the country illegally and had no money or a driver's license.

### 5. The 2012 investigation.

In 2012, during defendant and J.'s divorce, J. and L.C. were not living with defendant. L.C. was not doing well and at one point tried to kill herself because of her father's abuse. In November 2012, she disclosed the sexual abuse to her mother, who called the police. L.C. was referred for a sexual assault response team (SART) exam but did not take it. L.C spoke with a social worker but was not able to discuss all of the abuse. She was able to write that defendant raped her three times. C.C., M.C., and A. were also interviewed and denied any sexual abuse. C.C., M.C., and M. discussed not disclosing the abuse because they were afraid of their family being "torn apart."

On December 6, 2012, J. notified Detective Franchville that her son, M., had told her about an incident involving C.C., M.C., and defendant.

6. *The 2016 investigation.*

On April 25, 2016, when C.C. was 16 years old, she and her father got into an argument while driving. When they returned home, C.C. called her boyfriend and told him to have his aunt call CPS. CPS contacted C.C. By reporting the abuse, C.C. hoped defendant would be punished for what he had done, and she would prevent him from abusing her younger sister, A. The following day, CPS spoke with M.C., who also disclosed that she had been abused. M.C. wrote down her account in a letter, which was entered into evidence. CPS then contacted the sheriff's department. A detective interviewed both C.C. and M.C. The detective also interviewed defendant, who denied the allegations. R.A. continued to deny that she had been sexually abused until Christmas 2017.

7. *Expert testimony regarding child sexual abuse accommodation syndrome (CSAAS).*

Dr. Jody Ward, a clinical and forensic psychologist, testified regarding CSAAS, which describes a "pattern of behaviors that many children exhibit who have been sexually abused." She explained that children abused by a family member in an ongoing relationship tend not to report the abuse right away and, since they tend not to be believed, they suffer more consequences from the abuse. Dr. Ward described five stages of CSAAS: (1) secrecy, (2) helplessness, (3) entrapment, (4) delayed, unconvincing

6

disclosure, and (5) recantation. She did not review any police reports or talk about any aspects of this case because she was not talking about the particular children in this case.

*C. The defense.*

Jonathan Mendoza, an immigration attorney, testified about the process of obtaining a green card for legal status in the United States. He explained that a "U visa," which can be obtained by the parent of a cooperating crime victim, takes longer to process than a "family-based petition," and a family-based petition is more expensive.

Defendant's youngest daughter, A., testified that defendant had never acted inappropriately toward her.

A child forensic interviewer testified she had interviewed M.C., C.C., and A. on December 14, 2012. M.C. and C.C. both denied that anyone had touched them inappropriately or that they were afraid of their father. In response to a question, M.C. stated that L.C. had said defendant bothered her because of custody issues with their brothers.

Defendant testified. He denied ever molesting, inappropriately touching, or raping his daughters. In late 2012, defendant and J. were having child custody issues because defendant wanted custody of the three boys. L.C.'s allegation kept him from obtaining custody. In 2016, on the day before C.C. accused defendant of molesting her, the two had an argument. When asked what the argument was about, he said, "in my household, we like to debate politics and things like that." The prosecutor objected under Evidence Code section 402, and the judge struck the answer. Around the same time prior to C.C.'s allegations, defendant and S. discussed her immigration status; he did not have enough

money to sponsor her. Defendant stated that C.C. hated him in 2015 and 2016 and was "very rebellious."

Three character witnesses—defendant's uncle, cousin, and mother—vouched for defendant's character of being honest, law-abiding, and a good father to his children. Defendant's mother also testified that in 2015 and 2016, both S. and R.A. discussed S.'s undocumented status and expressed concern about the amount of time it was taking. Upon learning of her son's arrest, defendant's mother asked R.A. if defendant had done anything to her, and R.A. said no.

*D. Stipulations.*

The parties stipulated that (1) social worker K. Phillips interviewed A., C.C., and M.C. on November 14, 2012, and they all denied that defendant had sexually or physically abused them; (2) S. hired an attorney in 2016 to apply for permanent residence using R.A. as a sponsor; (3) S.'s attorney never tried to file for a U visa, and neither the sheriff's department nor the district attorney's office had received any U visa requests from S. or anyone on her behalf; (4) S. obtained her green card on June 22, 2017; and (5) neither C.C. nor M.C were approached by S. or anyone regarding a U visa or its requirements, and they never took steps to obtain one for S.

## II. DISCUSSION

Defendant asserts (1) the trial court erred in excluding evidence of witness bias, (2) the court erred in admitting expert evidence on CSAAS, (3) defense counsel was ineffective by not presenting expert evidence that defendant did not fit the profile of a child molester and by failing to object to the prosecutor's questions concerning whether

C.C., M.C., R.A., and S. were lying and conspiring against defendant, and (4) the court erred in allowing cross-examination of defendant's character witnesses with hypothetical questions assuming his guilt. We reject these contentions and affirm.

A. *Evidence of Witness Bias.*

Defendant asserts that the trial court abused its discretion and violated his constitutional rights to a fair trial and to present a defense by excluding evidence that S. and the children were biased against him because of "his support for President Donald Trump and [his] immigration policy." We disagree.

*1. Further background information.*

Prior to trial, the parties informally discussed the prosecution's motion in limine regarding "the concept of immigration as it pertains to this case." More specifically, the trial court stated, "I am not going to allow any reference to Donald Trump under any circumstances, in any way, shape, or form. It is irrelevant. It is prejudicial. It requires an undue consumption of time, and you are instructed, as are you being instructed to tell all of your witnesses, they are not to mention Donald Trump's name at all. That's my ruling." The court later asked defense counsel if he "[c]are[d] to be heard on the Trump issue?" Counsel replied, "No, Your Honor, I do not. I think I could work around that, as you directed and ordered, and I will do that." However, the prosecutor expressed concern the evidence would "get in" because "one of the initial disclosures in this case came from an argument between one of the [alleged] victims and the defendant" regarding "Candidate Trump." The trial court responded, "Well, I can't be clearer. If someone violates my order as it related to this political issue, that is such a hot potato in the United

9

States right now, I will recess, and out of the presence of the jury, very directly express to you my displeasure. . . . [¶] . . . And I will consider it a violation of a direct court order. So just be forewarned. I'm not going to play around with that."

Acknowledging the court's directive, defense counsel asserted that "one of [C.C.'s] motivations, besides the immigration, is her hatred for her father, which she said she had because of his support for Donald Trump" and which "the defense believes is a motivating factor for her to lie." Counsel thus inquired whether he could ask C.C. the following: "'Was your discussion with your dad where you said you hated him, was that a result of the different candidates who were running for office?'" The court answered, "The answer is no. That's too close to my ruling. It is irrelevant. It is immaterial. Under [Evidence Code section] 352 analysis, it is more prejudicial than probative, and it would require an undue consumption of time. That is my ruling. I don't want any slipping up to the edge of the envelope with that." The court clarified that the victim could be asked about her dislike of her father for reasons unrelated to any alleged sexual abuse without asking about politics and Donald Trump. Defense counsel responded, "But for the record, I think . . . my ability to ask [C.C.] questions about her motivation to make up the story about her dad has been somewhat restricted by the Court's ruling." The court replied, "I could not disagree more, and I don't think trying to interject Donald Trump into the trial has any relationship to this trial whatsoever, and I have made the basis for my ruling very clear on the record, including undue consumption of time. [¶] So I respect your right to advocate as strenuously as you want to, and I can understand why you would like nothing more than to interject Donald Trump into this trial given the

10

diversity of opinions about our current president. . . . [¶] . . . [However, n]o matter how much you advocate, I don't see any relevance at all to Donald Trump."

Following the jury's verdict, the defense moved for a new trial on the grounds defendant should have been allowed to show (1) he was an avid, staunch, and vocal supporter of President Donald Trump, (2) S. and their children strongly disagreed with his views, (3) S. had made multiple comments that she hated him because of his support for President Trump, (4) their feelings centered around his support for President Trump and his immigration policy, (5) S. had stated in front of the children that "*Trump should be assassinated, and* [*defendant*] *deserved what he got*," and (6) the defense would have provided this as a theory of the motive to fabricate. Defense counsel argued the evidence was relevant because the issue was so divisive. The prosecutor opposed the motion, arguing (1) the jury heard information about the "argument" between C.C. and defendant, which "evolved into name calling, where they called each other bad people based upon conduct that each was alleged to have done," (2) the trial court "articulately and thoughtfully" expressed its reasons for excluding any evidence involving President Trump, and (3) defendant never attributed his daughters' allegations to his support of President Trump during his initial interview. The trial court denied the motion.

### 2. Exclusion of the evidence.

Under Evidence Code section 352 (section 352), a trial court has the discretion to exclude evidence if its probative value is substantially outweighed by the probability that its admission will create a substantial danger of undue prejudice. We will not disturb a trial court's decision to admit or exclude evidence under section 352, "except on a

11

showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9-10.)

Here, defendant notes the trial court's concern that "evidence about biases related to Trump were too divisive," but argues, "that's just the point. That goes to the heart of the defense theory. It was so divisive that it provided part of the motive for the fabricated charges." Notwithstanding the points defendant raises, we are not convinced the court erred in excluding the proposed evidence under section 352. As noted *ante*, the evidence was irrelevant and had little probative value. The jury heard the victims' testimony regarding the charged offenses, and jurors were made aware of a possible motivation for the victims to lie about their accusations. Specifically, defense counsel presented evidence of (1) defendant's divorce proceedings with both J. (custody over the boys) and S., (2) S.'s immigration status and the prospect of obtaining a U visa as the mother of a cooperating crime victim, and (3) defendant's argument with C.C. shortly before she accused him of molesting her. Presenting evidence that the argument concerned defendant's political views would have added nothing to the defense.

In contrast, evidence of defendant's support for President Trump would have been prejudicial to both sides. Regarding the inflammatory nature of this evidence, the trial court noted that the "very name [Trump] in this political climate triggers emotions that are breaking up friendships, breaking up families," "elicit[ing] a visceral response from people . . . [a]nd it could work both for or against either side. For example, you could have a juror on the case who was very much anti-Trump, and that would have been

12

devastating for the defendant . . . ." Moreover, to allow the presentation of evidence regarding the parties' political views would have been time-consuming. The defense would have had to present evidence regarding defendant's, C.C.'s, and S.'s political views, discussions the children participated in or heard, and the details of the argument between C.C. and defendant. Moreover, the prosecution would have had to cross-examine the witnesses on these points. When the trial court denied defendant's motion for new trial, it noted, "I couldn't even imagine how long jury selection would take if we had to question every potential juror about their political beliefs and issues they've had with the current political climate, et cetera."

Weighing the minimal probative value of the evidence of defendant's political views against the significant prejudicial effect and the likelihood that it would necessitate undue consumption of time, we conclude the trial court's decision to exclude the evidence was not arbitrary, capricious, or patently absurd.

### 3. Violation of constitutional rights.

Defendant contends that as well as constituting an abuse of discretion under section 352, the trial court's ruling also violates his federal constitutional rights to a fair trial and to present a defense. There is no indication defendant asserted these constitutional claims in the trial court. Although defendant contends that constitutional issues may be raised for the first time on appeal, the California Supreme Court has repeatedly held that constitutional claims not raised in the trial court are forfeited. (*People v. Catlin* (2001) 26 Cal.4th 81, 138, fn. 14 ["Defendant did not object on this ground below, and thus his constitutional claim has not been preserved for appeal."];

13

*People v. Carpenter* (1997) 15 Cal.4th 312, 372 ["[D]efendant did not raise most of these constitutional claims at trial, thus waiving them on appeal."]; *People v. Williams* (1997) 16 Cal.4th 153, 250 ["Defendant, however, waived these constitutional objections to the admission of . . . evidence by failing to raise them at trial."].)

At any rate, we find no constitutional deprivation. "In general, the '"[a]pplication of the ordinary rules of evidence . . . does not impermissibly infringe on a defendant's right to present a defense." [Citations.]' [Citations.] We have recognized, however, that Evidence Code section 352 must yield to a defendant's due process right to a fair trial and to the right to present all relevant evidence of *significant* probative value to his or her defense. [Citation.] [¶] Although the complete exclusion of evidence intended to establish an accused's defense may impair his or her right to due process of law, the exclusion of defense evidence on a minor or subsidiary point does not interfere with that constitutional right. [Citation.] Accordingly such a ruling, if erroneous, is 'an error of law merely,' which is governed by the standard of review announced in *People v. Watson* (1956) 46 Cal. 2d 818, 836." (*People v. Cunningham* (2001) 25 Cal.4th 926, 998-999; see *People v. Espinoza* (2002) 95 Cal.App.4th 1287, 1317 ["Where a 'trial court's ruling did not constitute a refusal to allow defendant to present a defense, but merely rejected certain evidence concerning the defense,' the ruling does not constitute a violation of due process and the appropriate standard of review is whether it is reasonably probable that the admission of the evidence would have resulted in a verdict more favorable to defendant."].)

Although the trial court's ruling did result in the exclusion of evidence of the opposing political views of defendant and his family, "we are not convinced that this evidence was 'critical' to [his] defense or that its exclusion amounted to the exclusion of a defense rather than evidence concerning a defense." (*People v. Espinoza*, *supra*, 95 Cal.App.4th at p. 1317.) Defendant claimed the victims and S. had a motive to lie about the charged offenses. In support of this defense, the jury heard about his divorce proceedings with both J. and S., S.'s immigration status, the possibility of her obtaining a U visa as the mother of a cooperating crime victim, and his argument with C.C. shortly before she accused him of molesting her. In the context of this evidence, defendant's support for President Trump was not critical, and its exclusion did not preclude him from presenting a defense.

### B. Expert Evidence on CSAAS.

Defendant contends the trial court erred in admitting expert evidence on CSAAS and instructing the jury with CALCRIM No. 1193. On the merits, we conclude defendant's contentions fail.

#### 1. Further background information.

Prior to trial, the prosecutor argued that expert testimony on CSAAS was "needed to disabuse the jurors of the commonly held misconceptions about child sexual abuse and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior, including delayed reporting, inconsistent statements, and recantation." Defense counsel argued for exclusion on the grounds the evidence is unreliable and will not assist the jurors. Alternatively, counsel argued the evidence should be limited in scope to

15

situations where the victim is unable to explain why her disclosure was delayed. The trial court allowed the testimony. The jury was instructed with CALCRIM No. 1193 as follows: "You have heard testimony from Dr. Jody Ward regarding child sexual abuse accommodation syndrome. [¶] Dr. Ward's testimony about child sexual abuse accommodation syndrome is not evidence that the defendant committed any of the crimes charged against him. [¶] You may consider this evidence only in deciding whether or not [L.C.'s, R.A.'s, C.C.'s, and M.C.'s] conduct was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of their testimony."

### 2. CSAAS evidence was relevant and admissible.

Defendant asserts, "Dr. Ward's testimony was not probative of any material issue in dispute in this case [because t]he only disputed material issue . . . was whether [he] sexually abused his daughters or not." Thus, he argues, "the slightest prejudicial impact of the testimony justified its exclusion under Evidence Code section 352." We disagree.

Expert testimony concerning CSAAS is admissible "to disabuse jurors of commonly held misconceptions of child sexual abuse and the abused child's seemingly self-impeaching behavior." (*People v. Gonzales* (2017) 16 Cal.App.5th 494, 504 (*Gonzales*) ["The CSAAS evidence simply neutralizes the victim's apparently self-impeaching behavior."].) Section 352 provides, in part, that "[t]he court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice . . . ." "'In applying [Evidence Code] section 352, "prejudicial" is not synonymous with "damaging."'" (*People v. Karis* (1988) 46 Cal.3d 612, 638.) It involves evidence that

16

tends to "'evoke an emotional bias against the defendant . . . which has very little effect on the issues.'" (*Ibid*.) The decision to admit or exclude expert CSAAS testimony is reviewed for abuse of discretion. (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1299 (*McAlpin*).)

Here, Dr. Ward's testimony was relevant to dispel any myth or misconception about L.C.'s, R.A.'s, C.C.'s, and M.C.'s delay in reporting the abuse and the fact that they initially denied it. Any potential prejudicial impact was reduced because Dr. Ward testified she was not aware of the facts of the case. She stated that she was not expressing any opinion as to whether any of the victims suffered from CSAAS or if defendant was in fact a child molester. No reasonable juror would have believed her testimony was an attempt to prove defendant committed the charged offenses. (*People v. Housley* (1992) 6 Cal.App.4th 947, 955-956 (*Housley*).) Prior to deliberating, the jury was properly instructed with CALCRIM No. 1193, which conveyed "Dr. Ward's testimony about child sexual abuse accommodation syndrome is not evidence that the defendant committed any of the crimes charged against him." We presume the jury followed this instruction. (*People v. Cain* (1995) 10 Cal.4th 1, 34.)

*3. CALCRIM No. 1193 does not violate defendant's right to due process.*

Defendant contends the trial court erred by giving the jury CALCRIM No. 1193 because it effectively allowed them to use Dr. Ward's testimony as "evidence of [his] guilt," thus violating his right to due process. Although defendant concedes he did not object to CALCRIM No. 1193 or request a modification of the instruction, we consider his appellate contention because "the forfeiture rule 'does not apply when . . . the trial

17

court gives an instruction that is an incorrect statement of the law,'" and that is what defendant claims happened here. (*People v. Gomez* (2018) 6 Cal.5th 243, 312.)

"The independent or de novo standard of review is applicable in assessing whether instructions correctly state the law." (*People v. Posey* (2004) 32 Cal.4th 193, 218.) "'It is well established in California that the correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction.' [Citations.] [¶] 'We credit jurors with intelligence and common sense [citation] and do not assume that these virtues will abandon them when presented with a court's instructions. [Citations.]' [Citation.] [¶] We ask whether a 'reasonable juror would apply the instruction in the manner suggested by defendant.'" (*People v. Bragg* (2008) 161 Cal.App.4th 1385, 1395-1396.)

In challenging CALCRIM No. 1193, defendant asserts the instruction is "worded entirely in terms of the purposes for which the jury can use CSAAS testimony; it does not say that there is any purpose for which they cannot use it." He therefore claims that using Dr. Ward's testimony "as evidence the alleged victims were 'believable,' . . . is indistinguishable from using it as evidence [he] committed the crimes charged against him." Since CALCRIM No. 1193 "misled the jury into relying on the expert's testimony to bolster the witnesses' credibility, [defendant argues] it lessened the prosecution's burden of proving guilt beyond a reasonable doubt[, and] it violated [his] rights to due process under the federal constitution."

As defendant concedes, this same argument was rejected in *Gonzales*, *supra*, 16 Cal.App.5th at p. 504. However, he argues that "*Gonzales* was wrongly decided and

18

the court's explanation of how the jury would understand the instruction is why the instruction is problematic." We are not persuaded. While CALCRIM No. 1193 does not say that "there is any purpose for which [jurors] cannot use it," it does contain language that clearly conveyed that point. Specifically, the instruction told the jurors that Dr. Ward's testimony was "not evidence that the defendant committed any of the crimes charged against him." Defendant acknowledges this language and that it is "mentioned in CALCRIM No. 303[2] (which the court also gave [without] specify[ing] that [it] applies specifically to the CSAAS testimony . . .)," but he contends "for the jury to understand" the limited use of CSAAS testimony, they "first need to understand . . . that there is a difference between 'the complaining witness is believable' (one of the purposes authorized by the instruction) and 'the victim's molestation claim is true' (the purpose forbidden by *Housley*)." We disagree.

CALCRIM No. 1193 does not allow the jury to conclude that defendant molested his daughters based solely on Dr. Ward's testimony. Rather, it allows the use of the expert's testimony as one factor in assessing the victims' credibility. Defendant's argument confuses two types of evidence: (1) evidence relevant to a victim's credibility; and (2) evidence that the defendant committed the charged offenses. However, the two types of evidence are different, and case law recognizes this difference. (See *Housley*, *supra*, 6 Cal.App.4th at p. 956 [CSAAS evidence is properly admitted "to rehabilitate [the victim's] credibility and to explain the pressures that sometimes cause molestation

---

**2** "During the trial, certain evidence was admitted for a limited purpose. You may consider that evidence only for that purpose and for no other." (CALCRIM No. 303.)

19

victims to falsely recant their claims of abuse."]; *People v. Bowker* (1988) 203 Cal.App.3d 385, 394 [Although CSAAS evidence may not be "used to determine whether the victim's molestation claim is true," it may be used "to rebut defense attacks on the [victim's] credibility."]; *McAlpin*, *supra*, 53 Cal.3d at p. 1300 [Although CSAAS evidence is "not admissible to prove that the complaining witness has in fact been sexually abused," "it is admissible to rehabilitate such witness's credibility."].)

Here, CALCRIM No. 1193 did not require the jury to accept the CSAAS evidence or infer that L.C., R.A., C.C., or M.C. were sexually abused. Rather, it expressly told the jury not to use Dr. Ward's testimony as "evidence that the defendant committed any of the crimes charged against him" and advised that jurors could consider the evidence "only" for the limited purpose of "deciding whether or not [L.C.'s, R.A.'s, C.C.'s and M.C.'s] conduct was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of their testimony." In separate instructions, the jury was also informed of the presumption of innocence and the People's burden to prove defendant guilty beyond a reasonable doubt. Taken together, these instructions are clear, a reasonable juror would have understood them, and they did not create any risk that jurors would believe they could rely on the expert testimony to convict defendant even if guilt had not been proven beyond a reasonable doubt based on other evidence. (Accord, *Gonzales*, *supra*, 16 Cal.App.5th at pp. 503-504 [rejecting defendant's argument that "it is impossible to use the CSAAS testimony to evaluate the believability of [the victim's] testimony without using it as proof that [defendant] committed the charged

20

crimes," and holding that CALCRIM No. 1193 "was proper and did not violate due process"].)

Because we find no instructional error, we need not, and do not, consider the People's harmless error argument.

### C. Ineffective Assistance of Counsel.

Defendant asserts his trial counsel was ineffective by not presenting expert evidence that he did not fit the profile of a child molester and by failing to object to the prosecutor's cross-examination concerning whether the victims were lying and conspiring against him.

"Under both the Sixth Amendment to the United States Constitution and article I, section 15, of the California Constitution, a criminal defendant has the right to the assistance of counsel." (*People v. Ledesma* (1987) 43 Cal.3d 171, 215.) To prevail on a claim of ineffective assistance of counsel, a defendant must establish that his counsel's performance was deficient and that he suffered prejudice. (*Strickland v. Washington* (1984) 466 U.S. 668, 687.) Deficient performance requires a showing that "counsel's representation fell below an objective standard of reasonableness" "under prevailing professional norms." (*Id*. at p. 688.) With respect to prejudice, a defendant must show "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Id*. at p. 694.) "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." (*Id*. at p. 697.)

### 1. Failure to present a Stoll[3] expert.

#### a. Further background information.

Prior to trial, defense counsel obtained a psychological assessment of defendant from Laura A. Brodie, Ph.D., who interviewed him on July 28, 2017. She stated that the results of defendant's testing "suggested typical, heterosexual, age-appropriate sexual interests involving adolescent and adult females. There was no indication of sexually deviant interests involving paraphilic stimuli, such as exhibitionism, voyeurism, prepubescent children, or sexual violence." Dr. Brodie opined that the "findings from [defendant's] psychosexual evaluation indicates that at the time of assessment, he does not have a deviant sexual interest in prepubescent children, he does not have a diagnosable mental illness and he is not predatory."

On June 14, 2019, after the verdict but before sentencing, the trial court relieved Mr. Greenberg as defendant's attorney and appointed Mr. Exum as his counsel. Mr. Exum filed a motion for new trial on the ground of ineffective assistance by failing to call Dr. Brodie as an expert witness. The motion was accompanied by Dr. Brodie's written report and a declaration from Mr. Greenberg. Mr. Greenberg declared that he did not "call Dr. Laura A. Brodie as a witness for tactical reasons." On July 11, 2019, the court denied defendant's motion.

---

[3] *People v. Stoll* (1989) 49 Cal.3d 1136 (*Stoll*).

22

b. Analysis.

Psychological opinions based upon personal examination and analysis of accepted psychological tests are admissible as character evidence tending to show that a defendant was or was not likely to have committed a particular act. (*Stoll*, *supra*, 49 Cal.3d at p. 1153; Evid. Code, § 1102, subd. (a).) In *Stoll*, a child molestation case, the California Supreme Court held that the trial court erroneously excluded a psychiatrist's opinion that the defendant had a "'normal personality function,'" that the defendant had not previously engaged in "'sexual deviancy of any kind,'" and that it was "'unlikely . . . she would be involved in the events she's been charged with.'" (*Stoll*, at p. 1149, italics omitted.)

Defendant insists "competent counsel would have used Dr. Brodie's testimony to show that [his] psychological makeup was not consistent with molesting a child." Not so. Defendant has not definitively established that Mr. Greenberg lacked a tactical reason for declining to present Dr. Brodie's testimony given his declaration to the contrary. At the hearing on the motion for new trial, defendant did not call Mr. Greenberg to testify to his tactical reasons. However, there are reasons why he may have decided not to introduce Dr. Brodie's testimony.

To begin with, Dr. Brodie's assessment of defendant was not all positive. According to the personality assessment inventory, defendant "produced a defensive profile, attempting to place himself in a more favorable light"; however, "[h]e did not respond in a manner that would make the inventory invalid." Trial counsel may have feared evidence of defendant's "defensive profile" would cause the jury to conclude that

23

he was lying. As the prosecutor argued, he was "hopeful that the defense would call [Dr. Brodie] because it would go towards a lack of credibility when the person who's evaluating him as to whether or not he has a sexual interest in children found him to be untruthful at times." Also, defendant did not need the *Stoll* evidence to support his assertion of innocence. The first accusation of sexual molestation was made during defendant's divorce from J., when the two were engaged in a heated custody battle over their sons. Thus, defendant stresses, "[t]he fact that sexual abuse allegations arise from a divorce/custody situation is a significant circumstance that flags a potential motive to fabricate." Through direct- and cross-examination of various witnesses, defense counsel was able to present this defense without Dr. Brodie's potentially damaging testimony. A reasonable juror could understand why children might have a motive to lie about a parent's conduct during a divorce.

The above reasons make Mr. Greenberg's decision not to present the testimony of Dr. Brodie a reasonable, if not compelling, tactical choice.

2. *Failure to object to the prosecutor's "'were they lying'" questions.*

a. Further background information.

While cross-examining defendant, the prosecutor asked, on numerous occasions,

whether C.C., M.C., R.A., or S. were lying and conspiring against him.[4] Defense counsel

registered no objection to these questions.

_____

[4] Regarding C.C. and M.C., the prosecutor asked: "Q: You heard [C.C.] say in court what she says you did to her, correct? [¶] A: I heard that, yes, sir.

"Q: And you are saying your daughter is a liar? [¶] A: I am saying she's lying when she said that, yes. [¶] . . . [¶]

"Q: You heard [M.C.] state in court what you did to her, correct? [¶] A: I heard her accusations in court, yes.

"Q: You are calling your daughter [M.C.] a liar, correct? [¶] A: When she made those accusations, she was lying, sir. [¶] . . . [¶]

"Q: In every accusation that you're aware she made, you're calling her a liar? [¶] A: Yes, I am, sir."

In reference to the victims' mother, S., the prosecutor asked: "Q: You heard [S.] testify in court that she found a note from [M.C.] and confronted you with it, correct? [¶] A: I heard that testimony, yes, sir.

"Q: And as you sit here today, you're saying she's lying? [¶] A: I'm saying those statements were lies, yes."

Regarding R.A., the prosecutor asked: "Q: You heard what she said you did to her during those years, correct? [¶] A: I heard her accusations, yes, sir.

"Q: And you are saying that she is a liar? [¶] A: I'm saying those accusations were a lie, yes.

"Q: So from this photograph of the five women sitting on the opposite side of the table from you, four are lying about you during these court proceedings? [¶] A: Yes, they were, sir."

After the prosecutor asked defendant about crying on the witness stand when he was shown cards from his family, the following exchange occurred: "A: It's my family, sir, yes. [¶] Q: Family that you're saying are liars? [¶] A: Yes, they are."

Finally, the following exchange occurred regarding the victims conspiring against defendant: "Q: . . . April 26, 2016, your mental state, you didn't have any reason to believe that your wife, at the time, [S.] was conspiring with your daughters to make something up, correct? [¶] A: When Franchville was interviewing me in April of 2016, I thought they must be conspiring to do something because they were lying about me.

"Q: You thought that? [¶] A: That's what I thought. There must be some kind of problem going on with them. They're obviously up to something. I was very confused, and I was shocked. [¶] Q: Okay. So that's what you would have said. You would have said, Hey, they're conspiring against me. You would have told the investigator that? [¶] A: Probably not."

25

b. *Analysis.*

Defendant contends the trial court erred in permitting the prosecutor to ask him a series of "'were they lying'" and conspiring questions. (*People v. Zambrano* (2004) 124 Cal.App.4th 228, 242 (*Zambrano*)].) [trial courts should consider "'were they lying'" questions in context].) Since defense counsel registered no objections to these questions, the claim is forfeited. (See *People v. Dykes* (2009) 46 Cal.4th 731, 763.) Anticipating our application of forfeiture, defendant contends his counsel was ineffective.

In *Zambrano*, two police officers testified that they purchased cocaine from defendant via a woman at a truck stop parking lot. (*Zambrano*, *supra*, 124 Cal.App.4th at p. 233.) At trial, the defendant admitted that he worked at the truck stop parking lot but denied engaging in any drug transaction. (*Ibid*.) On cross-examination, the prosecutor repeatedly asked him if the officers were lying when they testified. (*Id*. at pp. 234-235.) The prosecutor also asked if defendant wanted the jury to believe that the officers were going to risk their jobs by lying at his trial. (*Id*. at p. 234.) Defense counsel's objection was overruled. (*Ibid*.) The defendant answered that he did not know whether the officers would lose their jobs for lying, but he did not have drugs that day and did not use drugs. (*Ibid*.) On appeal, the defendant asserted the "'were they lying'" questions constituted prosecutorial misconduct. (*Id*. at pp. 239-240.) The *Zambrano* court agreed. (*Id*. at pp. 240-242.)

*Zambrano* does not bar all "'were they lying'" questions. (*People v. Chatman* (2006) 38 Cal.4th 344 (*Chatman*).) In *Chatman*, the California Supreme Court observed that "[i]f a defendant has no relevant personal knowledge of the events, or of a reason

26

that a witness may be lying or mistaken, he might have no relevant testimony to provide" because testimony cannot be based on conjecture or speculation. (*Id*. at p. 382; see Evid. Code, § 702.) Thus, this type of evidence would be inadmissible. (Evid. Code, § 210.) Conversely, "[a] defendant who is a percipient witness to the events at issue has personal knowledge whether other witnesses who describe those events are testifying truthfully and accurately. As a result, he might also be able to provide insight on whether witnesses whose testimony differs from his own are intentionally lying or merely mistaken. When . . . the defendant knows the other witnesses well, he might know of reasons those witnesses might lie. Any of this testimony could be relevant to the credibility of both the defendant and the other witnesses." (*Chatman*, at p. 382.) As a result, the *Chatman* court stated, "courts should carefully scrutinize 'were they lying' questions in context. They should not be permitted when argumentative, or when designed to elicit testimony that is irrelevant or speculative. However, in its discretion, a court may permit such questions if the witness to whom they are addressed has personal knowledge that allows him to provide competent testimony that may legitimately assist the trier of fact in resolving credibility questions." (*Id.* at p. 384.)

Here, the prosecutor's "'were they lying'" questions were similar to the questions deemed proper in *Chatman*. By choosing to testify, defendant placed his credibility in dispute. And, like in *Chatman*, he had personal knowledge of his interactions with C.C., M.C., R.A., and S. and of the events that they testified about. He thus had insight into their alleged "bias, interest, or motive to be untruthful." (*Chatman*, *supra*, 38 Cal.4th at p. 381.) Consequently, the prosecutor's questions elicited testimony that could assist the

27

jurors in resolving key credibility questions, and defense counsel was not ineffective for failing to object. (*Id*. at p. 384.)

We reach a different conclusion on the prosecutor's decision to ask defendant whether he believed the witnesses were conspiring together against him. That question was argumentative in nature and called for a speculative answer. (*Chatman*, *supra*, 38 Cal.4th at p. 381; *Zambrano*, *supra*, 124 Cal.App.4th at p. 242.) As such, we can conceive of no tactical reason why defense counsel chose not to object on these grounds. However, a reversal for ineffective assistance of counsel is required only if defendant can demonstrate prejudice, which he has failed to do. The prosecutor's conspiracy question was brief and was not particularly prejudicial. Defendant had already testified that he believed that the witnesses were not being truthful and, earlier, he testified of his belief that their allegations stemmed from the custody dispute in his divorce with J. Thus, it is not reasonably probable that he would have received a more favorable result had his counsel objected. (*Strickland*, *supra*, 466 U.S. at p. 694.)

### D. Cross-examination of Defense Character Witnesses.

Finally, defendant argues the trial court improperly allowed the prosecutor to question character witnesses with hypothetical questions that assumed he was guilty of the charged crimes.

#### 1. Further background information.

Several character witnesses testified on defendant's behalf. When cross-examining these witnesses, the prosecutor asked each of them whether their opinion of defendant's character would change, assuming he was guilty of the crimes charged in the

28

case.  R.R., defendant's uncle, testified that defendant is an honest, trustworthy, and upstanding citizen.  On cross-examination, the prosecutor asked, "Would it change your opinion if you heard that he asked his daughter, [M.C.], to have her touch his penis?" R.R. replied, "I wouldn't believe that."  The prosecutor followed up, "Well, would it change your opinion?  If you learned that, would it change your opinion as to truthfulness as you described it?"  R.R. answered, "Wouldn't change my opinion."

Defendant's cousin, J.C., testified that defendant is an honest, lawful, nonviolent person.  During cross-examination, the prosecutor asked, "As far as your opinion of his character, would it change your opinion if you heard him admit that he asked his daughter, [M.C.], for her to touch his penis?  Would that change your opinion if you heard that?"  She replied, "If that was true.  [¶]  . . . [¶]  Yes."

Defense counsel raised no objection to any of these guilt assuming hypotheticals.

### 2. Analysis.

Defendant acknowledges that his trial counsel did not object to the questions but insists that because they violate his due process rights, his arguments may be raised for the first time on appeal.  He also argues that given the constitutional implications of the questioning, this court should exercise its discretion to review his claims notwithstanding forfeiture.  We decline to exercise our discretion to examine the merits of defendant's claims.  The failure to object to the admission of evidence on constitutional grounds forfeits the issue on appeal.  (*People v. Demetrulias* (2006) 39 Cal.4th 1, 20-21; *People v. Benson* (1990) 52 Cal.3d 754, 786, fn. 7.)

29

Alternatively, defendant argues that defense counsel rendered ineffective assistance by failing to object to the prosecutor's guilt assuming hypotheticals. We disagree. Even if we assume defense counsel was deficient, defendant has failed to demonstrate prejudice. (*Strickland*, *supra*, 466 U.S. at pp. 688, 694.)

As defendant points out, federal courts have found that it is improper for a prosecutor to ask defense character witnesses guilt assuming hypotheticals. (See *U.S. v. Shwayder* (9th Cir. 2002) 312 F.3d 1109, 1121 ["use of guilt assuming hypotheticals undermines the presumption of innocence and thus violates a defendant's right to due process"]; *U.S. v. Guzman* (11th Cir. 1999) 167 F.3d 1350, 1354 ["district court should not have allowed the government to ask [the defendant's] character witness to assume that she was guilty of the instant offense"]; *U.S. v. McGuire* (6th Cir. 1984) 744 F.2d 1197, 1204 ["It would be error to allow the prosecution to ask the character witness to assume defendant's guilt of the offenses for which he is then on trial."]; *U.S. v. Candelaria-Gonzalez* (5th Cir. 1977) 547 F.2d 291, 294; *U.S. v. Oshatz* (2d Cir. 1990) 912 F.2d 534, 539.) However, the federal cases finding error are inapposite.

Here, the prosecutor did not ask the witnesses to assume defendant was guilty but rather whether it would change their opinions if they heard about the accusations. In *People v. Qui Mei Lee* (1975) 48 Cal.App.3d 516, a character witness testified that the defendant was honest. (*Id*. at p. 524.) On cross-examination, the prosecutor asked whether the witness had heard of the allegations made against the defendant. (*Ibid*.) The Court of Appeal concluded that the cross-examination was proper. (*Id*. at p. 526.) The appellate court observed that "the witness' testimony [was] delivered in the present tense.

30

. . . Whatever [the defendant's] reputation might have been before the charge, after the charge it is at least dubious. Thus where the character witness nonetheless states under oath that such defendant's reputation for honesty is presently good, there is a strong suggestion (to say the least) that he is not a credible witness. And on cross-examination, such lack of credibility may be demonstrated by asking him whether he in fact has heard of the commission of the offense for which the defendant is on trial." (*Id*. at p. 527.)

Here, R.R. initially refused to accept the hypothetical posed by the prosecutor, but upon further inquiry testified that it would not change his opinion of defendant. In contrast, J.C. indicated that such information, if she "heard him admit that he asked his daughter . . . to touch his penis," would change her opinion. While the response from J.C. was credible, the response made by R.R. was less credible. However, there was another reason to doubt R.R.'s impartiality—he is defendant's uncle. Considering the witnesses and their responses, we do not believe that this is a case where it is reasonably probable that absent the witnesses' responses, defendant would have received a more favorable result. As a result, we conclude defendant has not demonstrated prejudicial error under the *Strickland* standard.

## III.  DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

McKINSTER
Acting P. J.

We concur:


SLOUGH
J.


RAPHAEL
J.